Patricia CARTER

v.

SHOP RITE FOODS, INC.

No. CA–3–74–0620–G.

United States District Court,
N. D. Texas,
Dallas Division.

Sept. 12, 1980.

See also, D.C., 470 F.Supp. 1150.

Deborah Altemore McCann, Durwood D. Crawford, Seay, Gwinn, Crawford, Mebus & Blakeney, Bennie R. Juarez, P. C., Dallas, Tex., for Shop Rite Foods, Inc.

Linda N. Coffee of Palmer, Palmer & Coffee, Dallas, Tex., and Sue B. Goolsby, Dallas, Tex., for plaintiff.

Marvin Menaker of Bader, Wilson, Menaker, Cox & Branson, Dallas, Tex., for Retail Clerks Union No. 368, AFL–CIO.

## MEMORANDUM ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

The special master has filed a report recommending back pay awards, including interest to July 1, 1980, totaling $208,148.[1] The method by which these awards were

computed is complex, and will be discussed in some detail in the following section.

### I. *The Master's Report.*

The master first computed a quantity designated the "weekly differential" for each year for the positions of assistant manager, manager, and produce manager. This number consisted of the difference between the median salary for males in the respective managerial positions and an estimate of the average salary earned by the claimants.[2] The average claimant salary was used rather than the actual salary for each claimant because the master believed that higher–paid claimants should not be penalized for their presumably greater productivity.

The weekly differential was then multiplied by the number of weeks each claimant would have served in a managerial position absent discrimination. The latter figure was computed by assuming that each claimant would have been promoted after the median length of time served by male employees before promotion. Where claimants aspired to both the assistant manager/manager positions and the produce manager position, the promotion track resulting in the larger back pay award was used. The promotion ladder was assumed to begin on July 2, 1965, when Title VII became effective, rather than two years before filing of the EEOC charge, as urged by the defendant. This resulted in treatment of most claimants as incumbents in managerial positions from the beginning of the back–pay period.

The master did not make any allowance for the possibility that one or more claimants would absent discrimination have reached supervisory rank. While he found it likely that at least one claimant would have been so promoted, he found it impossible, or at least extremely difficult, to determine: (1) which claimant(s) would have

---

1. Amounts for each claimant are shown in column 3 of the appendix to this order.

2. These figures are presented on page 689 of the master's report.

been promoted; (2) to which position(s) they would have been promoted; and (3) the median time before promotion to supervisory rank. He also noted that, with one exception, all male supervisors had (unlike claimants) had managerial experience before coming to Shop Rite.

The result of applying hypothetical promotion times to the weekly differential was designated the "Vanilla Back Pay Award." The respective awards, which total $200,605, are shown in column 1 of the appendix.

The master determined that bonuses for employees in the assistant manager and manager positions were isolated occurrences, and recommended that no provision be made for bonuses in such positions. He recommended inclusion of a bonus ranging from $4 to $10 weekly in the produce manager's salary computations.

The master recommended use of a 6% annual interest rate, compounded weekly, for an effective annual rate of 6.18%. He considered and rejected inclusion of an additional amount as an inflation factor, on the ground that Title VII claimants should not fare better in this regard than other judgment creditors. The Vanilla Awards adjusted for interest to date are shown in column 4 of the appendix.

The master analyzed a variety of tax effects on the back pay awards, and concluded that no adjustment should be made. He determined that the detriment to the claimants due to lump–sum taxation of the awards in the year of receipt was roughly counterbalanced by the award of compound interest on the amounts which in reality would have been paid to the tax collector in the year in which earned. The master also concluded that the effects of FICA and unemployment taxes should be ignored.

The most troublesome problem facing the master was the treatment to be given the fact that male managerial employees were typically terminated (whether voluntarily or involuntarily is not known) after a short tenure in managerial positions.[3] Plaintiffs urged that this fact be ignored altogether, while defendant urged that each claimant's hypothetical tenure be cut short after the median male tenure had elapsed, even if this meant that some claimants would have been hypothetically terminated before the back–pay period began.

The master employed two basic approaches to take this factor into account. First, he computed the rough odds of a particular claimant being terminated after varying times in a given position. These odds were then factored into the week–by–week computations of the Vanilla Awards: the weekly differential was multiplied by the estimated probability that the claimant would have remained in the position during the week in question. To prevent some claimants' awards from being sharply reduced even at the beginning of the period, the master did not apply a probability factor to the weekly differential until the median number of weeks, shown in n.3, had elapsed from the beginning of the period. The results of these calculations are shown in column 2 of the appendix, and the awards so computed (with interest to July 1, 1980) total $236,073.69.[4]

In the master's second approach, which he ultimately adopted, the aggregate Vanilla Award was first reduced by 40%, then multiplied by an interest factor. This figure ($173,870) was then used as an aggregate award for 11 "major" claimants. Each claimant's share of this award was determined by multiplying the number of weeks "worked" as manager, plus $2/3$ of the weeks worked as assistant manager and $1/3$ of the

---

3. After adjustments made by the master to make the figures more realistic, the median times were 87 weeks for manager, 41 weeks for assistant manager, and 67 weeks for produce manager.

4. These figures are designated in the appendix as the "Appendix H Award."

weeks worked as clerk, by the claimant's average weekly wage as clerk, and dividing by the total of this quantity for all claimants.

In addition to the recommended awards computed by this method for 11 claimants, seven other awards were recommended. Claimants Brown and Lamb, hypothetically promoted to produce manager, were given the so–called Appendix H award, including bonus. Claimants Simpson, Spencer, and Williams were given amounts which were stipulated or which could be computed from stipulated amounts. Claimant Stricklin was awarded the difference between the wages she received as meat wrapper and the wages she would have received as apprentice meat cutter, with interest. Claimant McDowell was given the difference between what she earned as a part–time clerk and what she would have earned as a full–time clerk. These "special case" awards bring the recommended award to $208,148, the Vanilla Award to $219,300 ($330,255 with interest), and the Appendix H award to $254,769.

## II. *The Parties' Objections.*

Plaintiffs have filed extensive objections to the master's report. Their objections may be summarized as follows:

(1) The reduction for probability of termination in the Appendix H award and the recommended award was improper.

(2) The master should have included an inflation factor.

(3) The use of average claimants' salaries rather than actual claimants' salaries in computing the Vanilla and Appendix H awards was inappropriate.

(4) The master should have included bonuses for assistant managers and managers.

(5) The failure to award a differential for nonpromotion to supervisor was erroneous.

(6) Claimant McDowell should not have been limited to the higher of the differential between part–time clerk and full–time clerk and between full–time clerk and produce manager.

(7) Plaintiffs urge adoption of the master's recommendations regarding tax effects.

Defendant has responded to the master's report by letter, also presenting objections:

(1) The claimants should not have been automatically promoted into the highest position (except for supervisor) they could statistically achieve.

(2) The master only partially took into account the fact the male managers were soon terminated.

(3) The assumption that those seeking both produce manager and assistant manager/manager promotion tracks should receive the higher of the corresponding awards is unfair.

(4) The award to Claimant Strickland should have been based on the one actual vacancy and not on a hypothetical vacancy.

## III. *The Termination Factor.*

The approach finally recommended by the master adjusts for the probability of termination by reducing the aggregate Vanilla Award by 40%. This figure was obtained through a complicated statistical estimation process, and represents the master's best estimate of the effect of the termination probability given an underlying assumption (favorable to claimants) that the termination probability begins only at the beginning of the back pay period. This reduction is based on the assumption that female managers as a group would not have performed significantly better than male managers as a group.

Plaintiffs, citing *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 773 n.32,

96 S.Ct. 1251, 1268 n.32, 47 L.Ed.2d 444 (1976), argue that uncertainty about the claimants' work performance following their hypothetical promotion must be resolved against the defendant, whose unlawful conduct created the uncertainty. They argue further that the median male tenure figures, even after adjustments by the master, are unrepresentative of the true tenure the female managerial employees would have achieved, because they include male managers who were managing at the end of the back pay period and whose true tenure is thus underestimated, and because due to discrimination the male managers are presumably as a whole less qualified than their female counterparts. Defendant argues, on the other hand, that absent evidence showing a longer tenure would have been achieved by a particular claimant or claimants, each claimant must be hypothetically terminated after the median male tenure, and that consideration must be given to the possibility that a female assistant manager would have been terminated rather than promoted to manager.

■ The court agrees with plaintiffs that no reduction should be made for termination probabilities, but for a reason slightly different from those articulated by them. It is true that some male employees may have been terminated, voluntarily or involuntarily, due to their unsuitability as supermarket managers or assistant managers. These employees may well have been paid less than their Shop Rite managerial counterparts at the jobs they assumed after leaving Shop Rite. Indeed, they may have been paid less than the average claimant's salary, or may have been unable to obtain employment at all. On the other hand, terminated employees may have been fully competent managers, and may have obtained managerial positions elsewhere at salaries equal to or greater than their Shop Rite salaries. In such cases, Shop Rite's discrimination would have prevented claimants from obtaining the skills and experience which would have enabled them to obtain lucrative employment elsewhere.

A pair of diagrams may be helpful:

Figure 1 shows the award urged by defendant (after appropriate adjustment for the probability of failure to reach the manager level): it is assumed that the claimant would have been terminated after the median male tenure *and* that she would have earned a clerk's salary at her new job, *i. e.,* that she would have acquired no transferable skills or experience as a Shop Rite manager. Figure 2 shows the award urged by plaintiffs: it is assumed that the claimant would have remained at Shop Rite as manager *or* that she would have earned an equal amount elsewhere. The crosshatched portion of the figure may be regarded as the return on transferable skills or experience following a hypothetical termination.

Of the two sets of assumptions underlying these models, the latter is the more

reasonable. Even if large numbers of male employees were involuntarily terminated for poor performance (a fact not shown by the evidence), there is no reason to believe that those employees were forced to accept no more than a clerk's salary at their new jobs. While some terminated employees may have had to accept lower–paying jobs due to economic conditions or to adverse inferences drawn by their new employers from the fact of their termination, others may have voluntarily left Shop Rite in order to assume higher–paying jobs elsewhere, perhaps even at the supervisory level.[5] In the absence of evidence showing that hypothetically terminated employees would have earned a lower salary, the court must resolve doubts in favor of the claimants by awarding them a manager's salary notwithstanding the possibility of termination.[6]

This approach is in accord with the widely–recognized Fifth Circuit rule that uncertainty in determining what an employee would have earned but for discrimination should be resolved against the employer. *United States v. United States Steel Corp.*, 520 F.2d 1043, 1050 (5th Cir. 1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 260–61 (5th Cir. 1974). As the court noted in *United States v. United States Steel Corp.*, *supra*, "once a court has determined that a defendant's inequitable conduct caused *some* damages to the class, or to a representative sample of its members, then the burden falls upon the wrongdoer to explain away or disprove the damages which each claimant's evidence arguably supports." 520 F.2d at 1050. The computation of back pay under these principles is within the court's discretion, and there is no single correct formula for computing back pay. *United States v. Allegheny–Ludlum Industries, Inc.*, 517 F.2d 826, 852 n.29 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).[7]

## IV. *Inflation.*

Few courts have squarely faced the question of whether a Title VII back pay award should include, explicitly or implicitly, an adjustment for inflation occurring between the time of the discrimination and the time of the back pay award. Such a factor has been explicitly included by one district court, *see Lewis v. Philip Morris, Inc.*, 13 Empl.Prac.Dec. ¶ 11,350, at 6169 (E.D.Va. 1976), but that decision appears to stand alone. Other courts have denied inflationary adjustments outright, *see Kinsey v. Legg Mason Wood Walker, Inc.*, 16 Empl.Prac.Dec. ¶ 8,168, at 4825 (D.D.C.1978) (recovery of interest and inflation factor would be double recovery), or have adjusted for inflation through an increase in the interest rate applied to the award, *see EEOC v. Pacific Press Publishing Association*, 482 F.Supp. 1291, 1319–20 (N.D.Cal. 1979) (adjusted prime rate); *Patterson v. Youngstown Sheet and Tube Co.*, 475 F.Supp. 344, 355 (N.D.Ind.1979) (8%). *Cf. Chapman v. Pacific Telephone and Telegraph Co.*, 456 F.Supp. 77, 80 (N.D.Cal.1978) (inflation factor denied where salaries included cost–of–living adjustments). *See*

---

**5.** Similarly, employees terminated at the assistant manager level may have become managers elsewhere.

**6.** A defendant is arguably not responsible for loss of a return on transferable experience after an employee has left its employ, but such a situation is not involved here. Claimants seek only an award for the period after they were hypothetically terminated under the master's reconstruction efforts, not for the period after they actually left Shop Rite. While claimant Yarbrough argues that consistency requires that the master's percentage tenure adjustments be applied to her over the entire four-year period (although she was not employed during that entire period) if they are to be applied at all, she does not claim a back pay differential after leaving Shop Rite if she receives full back pay during the period she was employed at Shop Rite.

**7.** Under this disposition, it is unnecessary to reach plaintiffs' alternative contentions that the male tenure figures in n.3, *supra*, are inaccurate and unrepresentative of female tenures.

*also English v. Seaboard Coast Line R. R. Co.,* 12 Empl.Prac.Dec. ¶ 11,237, at 5730 (S.D.Ga.1975) (pretermitting question).

While denial of an inflation factor in employment discrimination actions against the federal government, *see, e. g., Blake v. Hoston,* 22 Empl.Prac.Dec. ¶ 30,603, at 14,235 (D.C.Cir.1980); *Moysey v. Andrus,* 22 Empl.Prac.Dec. ¶ 30,834, at 15,328 (D.D.C. 1980), rests in part on special considerations not present in a case involving a private employer, the reasoning employed in a recent Fifth Circuit decision under the Back Pay Act, 5 U.S.C. § 5596, may be instructive. In *Payne v. Panama Canal Co.,* 607 F.2d 155 (5th Cir. 1979), the district court ordered that back pay calculations include an inflation adjustment in accordance with the Consumer Price Indices. The court reasoned that the statutory language, specifying an award of "an amount equal" to the pay differential, must be read as authorizing an inflation factor, since a 1964 dollar was not "equal to" a 1972 dollar. *Payne v. Panama Canal Co.,* 428 F.Supp. 997, 1001 (D.C.Z.1977). The Fifth Circuit reversed on this point, finding an inflation award inappropriate absent an express authorization for such an award in the statute or regulations. 607 F.2d at 165. Significantly, the court stated that "[t]he law does not recognize the impact on judgments of inflation occurring prior to the judgment," citing a patent infringement case. *Id.*

▮ The master's decision that Title VII claimants should not receive more favorable treatment *vis a vis* an inflation factor than other judgment creditors is in line with the Fifth Circuit's reasoning in *Payne.* While a court in a Title VII case undoubtedly retains the power to make appropriate adjustments in the interest rate to achieve an equitable balance of factors including inflation, an explicit adjustment for inflation could create additional administrative difficulties in the computation of back pay awards, *EEOC v. Pacific Press Publishing Association, supra,* at 1319, and would single out Title VII claimants for treatment not accorded other creditors.

▮ As various courts and economists have recognized, an interest award includes two elements: a recovery for the "time use of money," *i. e.,* compensation for deprivation of the use of funds without regard to inflation, sometimes referred to as a "true" interest rate; and a factor to compensate, fully or partially, for the diminution over time in the purchasing power of the funds, *i. e.,* an inflation factor. Expert testimony before the master establishes the "true" interest rate during the relevant period at 2–4%. Thus the 6.18% interest rate used by the master (which itself gives the claimants a slight advantage over other creditors, who would not ordinarily be entitled to compounding) includes an inflation component of 2.18–4.18%.

From 1972 through 1978, annual percentage increases in the national Consumer Price Index for Urban Wage Earners and Clerical Workers ranged from 5.77 to 10.97%. *See* 4 Lab.L.Rep. ¶ 7778, at 12,931. While the inflation component of the interest award does not keep pace with these figures, the award does correspond roughly to the actual rate of return claimants could have received. The factual basis for the master's report reveals that during the relevant period, savings yields were 4% on U.S. savings bonds, 5¼ to 5½% on savings accounts 6 to 6½% at credit unions. The simple fact is that the claimants, being small investors unable to invest their money for long periods of time, could not have kept pace with inflation in any event. *Cf. H. K. Porter Co. v. Goodyear Tire and Rubber Co.,* 536 F.2d 1115, 1124 (6th Cir. 1976) (this factor is one justification for denying an inflation adjustment in patent infringement case). This being the case, the master's proposed 6.18% figure represents a reasonable interest rate to be applied to the awards, and any further adjustment for inflation is unjustified. That the standard

6% legal rate of interest is outstripped by inflation is perhaps unfortunate; if so, however, it is a misfortune which ought to be shared equally by all creditors unless and until the main body of the law is altered to allow inflation adjustments.

### V. *"Average" Claimant Salaries.*

■ Plaintiffs next complain of the master's use of an "average claimant salary" for comparison to managerial salaries, rather than the actual salary earned by each claimant. They urge that this technique reduces the aggregate award by $22,023, and hence that the problem is by no means inconsequential. The figures used by the master as rough "average" claimant salaries[8] indeed differ considerably from the averages of the salaries of the 13 claimants for whom Vanilla Awards were calculated.[9] The master's figures are an average of $5.71/week higher than actual average claimant salaries, rendering the weekly differential a corresponding amount too low (on the average), if average claimant salary is to be used. On the other hand, the master's figures more nearly correspond to the *median* claimant's salaries,[10] being on the average 64¢/week *lower* than those figures. The purpose of the master's approach being to compare the salary made by a typical claimant (rather than the actual salary made by each individual claimant) with that made by a typical managerial employee, and the median figures more accurately reflecting the experience of a typical employee due to the presence of a few employees earning extremely low salaries and biasing the averages downward,[11] the use of median rather than actual figures is fair to the group of claimants as a whole.

The use of median rather than actual salaries is also fair to the claimant *inter sese.* As noted by the master, it is reasonable to assume that pay differentials among clerks are due to factors other than chance. Absent evidence to the contrary, it is also reasonable to assume that higher–paid clerks would have become higher–paid managers. This being the case, the weekly differential should be based (as the master in fact based it) on the salary difference between a typical manager and a typical clerk. This approach, while slopping some "milk" from one bowl to another, keeps the claimants' table dry as a whole, and gives each claimant a fair amount without rewarding those whose bowl is more than usually empty.

### VI. *Other Aspects of the Master's Report.*

■ The failure to award bonuses to assistant manager and manager aspirants and the failure to hypothetically promote any claimants into the supervisory ranks are urged primarily as *pro forma* objections at this stage. In both cases, the isolated nature of the occurrences among males renders prediction of the results which would have been achieved by claimants, absent discrimination, highly speculative. The failure to make either adjustment is therefore justifiable under the circumstances.

■ The master limited claimant McDowell to the higher of:

(1) the difference between the "average claimant's salary" (actually the median) and the hypothesized managerial salary (*i. e.*, the "Weekly Differential"); and

(2) the difference between McDowell's actual salary and the salary of a full–time clerk.

He reasoned that it would be inequitable to award McDowell the differential between

---

**8.** These figures are $125, $130, $145, $160, and $190, for 1971–75, respectively.

**9.** The actual averages (weighted in the cases of those claimants not working an entire year) are $118.65, $125.51, $138.51, $156.32, and $182.48, for 1971–75, respectively.

**10.** The figures are $123.44, $130.30, $143.50, $166.48, and $189.49, for 1971–75, respectively.

**11.** That the difference between the average and median salaries is due to a few outlying low salaries is shown by the following scatter diagram:

her part–time clerk's salary and a full–time salary as produce manager. Plaintiff objects to this award, arguing that if offered a full–time position McDowell could have progressed at the same rate as other clerks. Assuming *arguendo* that this is so, however, the fact remains that McDowell enjoyed the benefits of a part–time position, and it would indeed be inequitable to award her more on that account than her coworkers who were shouldering a full–time load.

While the tax effects of the awards are perhaps even more complex than recognized by the master, the court concurs with him and with plaintiffs [12] that tax effects should be ignored.

Defendants' argument that claimants should not have been automatically promoted to managerial positions loses sight of the fact that the burden of showing that a claimant would not have been promoted even absent discrimination is on the employer. *Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1178 (5th Cir. 1976), *cert. denied*, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976).[13]

The master's assumption that claimants seeking both assistant manager/manager and produce manager positions would have opted for the higher–paying track [14] is both consistent with an as-

**12.** Defendant has not spoken on the tax effects issue.

**13.** The evidence shows that several male employees had prior experience as managers or clerks with other employers. In order to prevent Shop Rite from paying the penalty for any societal discrimination which may have prevented the claimant group from obtaining similar prior experience, the master properly excluded male employees with prior experience

from the calculations of median male times to promotion. Thus inexperienced females were assumed to progress at the same rate as inexperienced males.

**14.** The master's assumption was technically one of an opting for the higher *back–pay* award rather than a higher *immediate salary* following promotion. These two approaches differ only in the case of claimant Lamb, and the difference amounts to only $367.

sumption of economic rationality and mandated by *Claiborne v. Illinois Central R. R.*, 583 F.2d 143, 151 (5th Cir. 1978), *cert. denied*, 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979).

Defendant's final point, regarding claimant McDowell, is foreclosed by the court's factual finding that "a number of vacancies occurred in the Assistant [sic; Apprentice] Meatcutter position while this claimant was in the Dallas district." *Carter v. Shop–Rite Foods, Inc.*, 470 F.Supp. 1150, 1169 (N.D. Tex.1979). The master's assumption of one hypothetical opening occurring midway between McDowell's transfer into the Dallas district and the one known vacancy in January, 1974, is thus reasonable.

For the foregoing reasons, the master's report is adopted except insofar as he reduces the awards for the possibility of termination. The amounts shown in column 5 of the appendix (Vanilla Awards plus 6.18% interest, together with the master's special–case awards) will be awarded to the respective claimants, subject to the modifications discussed in the following sections.

### VII. *Master's Fee and Expenses.*

 The special master, John A. Martin, has filed an application for payment of fees and expenses totaling $17,864. The parties do not object to this amount, and the court finds the master's request to be modest given the complexity of the issues and the competence and energy brought by the master to his task. The application for payment is therefore approved.

 Fed.R.Civ.P. 53(a) grants the court broad discretion in determining which party or parties shall bear the costs of reference to a master. *See generally* 5A *Moore's Federal Practice* ¶ 53.04[1], at 53–30–32 (2d ed. 1980). As items of costs, the master's fees and expenses would ordinarily be taxed against the losing party in the litigation. *See* Fed.R.Civ.P. 54(d). This result may, however, be altered by the court where circumstances warrant. For the rea-

sons which follow, the court believes that the master's fees and expenses should be borne equally by the two sides to the litigation.

Fifth Circuit precedent regarding splitting of master's costs is itself split. In *Bowen Motor Coaches, Inc. v. New York Casualty Co.*, 139 F.2d 332, 334 (5th Cir. 1943), the district court charged an auditor's fee against the losing party as costs. Citing the fact that appointment of the auditor was necessary in order to permit the plaintiff to prove its case and to permit the court to make an appropriate disposition of the case, the court of appeals modified the trial court's order to divide the expense equally between the parties. In *Bros Inc. v. W. E. Grace Manufacturing Co.*, 320 F.2d 594, 600 (5th Cir. 1963), on the other hand, the district court divided the costs equally. The court of appeals, noting that one party had prevailed as to almost all of its contentions before the master, and that that party had neither precipitated nor prolonged the reference, held that "no satisfactory basis appears for dividing these costs," and ordered the costs taxed against the losing party.

 In the present case, reference to a master was on the court's own motion. A variety of issues were presented by both sides to the master. On some issues (e. g., automatic promotion, use of higher–paying promotion track), plaintiffs prevailed before the master and in this court, while on others (e. g., inflation, supervisory promotions) defendants were successful. On the issue of termination reductions, each side was partially successful before the master. The master's resolution of tax effects also apparently meets with the approval of all parties. Since neither side is clearly the prevailing party before the master, and since the master's work benefitted both sides as well as the court, it is reasonable to apportion the cost of the master's services on an equal basis. Accordingly, while defendant is ordered to pay the master's fees and expenses forthwith, the respective claimants' awards will be reduced on a *pro*

*rata* basis so that half of the master's costs are borne by the group of claimants.[15]

## VIII. *Attorneys' Fees and Expenses.*

The court's memorandum order of May 17, 1979, provided that plaintiffs as the prevailing parties would be awarded reasonable attorneys' fees. Plaintiffs have filed an application seeking $172,500 in attorneys' fees, plus $15,000 for paralegal time and $3,738.23 in out–of–pocket expenses.

 The standards for award of attorneys' fees in Title VII cases in this circuit are set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). That case lists 12 factors to be considered in determining the amount of such an award, which will be discussed seriatim.

(1) *The time and labor required.* Plaintiffs' counsel spent a total of 1407.95 hours of attorney time and 656.8 hours of paralegal time. Given the duration and complexity of this case, these amounts of time were reasonably necessary to adequately litigate the case. Defendant argues that this case, in which since May of 1977 it has been known that attorneys' fees would be recoverable, has been used as a vehicle to litigate issues relevant to other Title VII class action cases in which plaintiffs' counsel was involved, which had not reached the "Phase II" stage and hence in which an award of attorneys' fees was uncertain. There is no evidence whatsoever that this motive prompted plaintiff's counsel to raise any issues in this case. Even were this the motive, however, the issues raised in this case were relevant to a proper determination of the case, and are therefore the proper subject of an award of attorneys' fees. Any incidental benefit to other pending cases is immaterial.

(2) *The novelty and difficulty of the questions.* While some of the issues in this case were those commonly raised in Title VII class actions, a variety of novel and difficult questions were presented. Among these were procedural questions regarding class certification, questions involving the shifting burdens of proof as the litigation progressed from Phase I to Phase III, and the damage questions discussed in this opinion.

(3) *The skill required to perform the legal service properly.* The issues discussed in (2) above required considerable skill and experience in the Title VII field for their proper presentation.

(4) *The preclusion of other employment by the attorney.* Apart from that caused by the sheer volume of time consumed in this case, *see* (1) above, there has been no significant preclusion of other employment.

(5) *The customary fee.* Plaintiffs' counsel's customary fee ranged during the pendency of this litigation from $75 to $125 per hour for attorney time, and $30–50 per hour for paralegal time. These customary fees are of course based on an assumption of prompt and reasonably certain payment.

(6) *Whether the fee is fixed or contingent.* Compensation for 504 hours spent during Phase I was contingent. Compensation for 609.20 hours in Phase II was partially contingent, since a finding of liability, which substantially increased the probability of success, had been entered. Time spent in Phase III (294.75 hours plus paralegal time) was noncontingent, since the court had announced its intention to award attorneys' fees and since some damage award was virtually certain.

(7) *Time limitations.* As noted by plaintiffs' counsel, time limitations were not a significant factor in this case.

(8) *The amount involved and the results obtained.* As noted in the preceding sections of this opinion, the efforts of plaintiffs' counsel resulted in an aggregate award of $321,325, representing 100% of the claimants' back pay entitlements.

(9) *The experience, reputation, and ability of the attorneys.* Plaintiffs' counsel is one of the most able, experienced, and dis-

---

**15.** The awards as so reduced appear in column 6 of the appendix.

tinguished members of the Title VII class action bar in this district.

(10) *The undesirability of the case.* Apart from any general undesirability of representation of plaintiffs in Title VII class actions, this case presents no special features of undesirability.

(11) *The professional relationship with the client.* There is little prospect of an ongoing professional relationship between plaintiff and her counsel.

(12) *Awards in similar cases.* Few Title VII class actions in this district have progressed to a final back pay judgment. Testimony in other, simpler cases establishes $80 per hour as an appropriate hourly rate.

Taking these factors into account, the court concludes that $120 per hour for contingent attorneys' time (Phase I), $100 per hour for partially contingent attorneys' time (Phase II), and $90 per hour for non-contingent attorneys' time (Phase III), are appropriate rates. Accordingly, $147,928 (representing an average of $105.07 per hour) will be awarded for attorneys' time. Paralegals' time (averaging $22.84 per hour) and expenses will be awarded as prayed for. The total award for attorneys' fees and expenses is thus $166,666.

## IX. *Summary.*

As modified herein, the report of the special master is adopted. Defendant shall promptly pay the master's fees and expenses in the amount of $17,864. Judgment will be entered for the respective claimants in the amounts shown in column 6 of the appendix to this order, together with the attorneys' fee award set forth above.

## APPENDIX

| Claimant | 1 Vanilla Award | 2 Appendix H Award | 3 Master's Recommendation | 4 Vanilla Award with interest[4] | 5 Gross Award[4] | 6 Award Net of 1/2 Master's Costs |
|---|---|---|---|---|---|---|
| Brammer | $ 11,854 | $ 14,282.56[1] | $ 13,700 | $ 17,543.11[1] | $ 17,543 | $ 17,069 |
| Brown | 6,515 | 10,514.04[1] | 10,514 | 12,352.47[1] | 12,352 | 12,018 |
| Carter | 20,186 | 22,509.38[2] | 18,465 | 31,109.36 | 31,109 | 30,268 |
| Debord | 17,825 | 19,950.76[2] | 16,257 | 27,183.60 | 27,184 | 26,449 |
| Decker | 20,186 | 22,509.39 | 18,674 | 31,109.36 | 31,109 | 30,268 |
| Dunafan | 18,985 | 21,587.12 | 17,648 | 29,247.61 | 29,248 | 28,457 |
| Inglet | 16,599 | 19,968.92[1] | 14,901 | 25,057.16[1] | 25,057 | 24,379 |
| Lamb | 2,812 | 5,069.00[1] | 5,069 | 5,267.10[1] | 5,267 | 5,125 |
| Massey | 18,294 | 21,021.60 | 14,396 | 28,090.20 | 28,090 | 27,330 |
| McDowell | | | 3,770 | | 3,815 | 3,712 |
| Pugh | 19,306 | 21,878.85 | 15,909[3] | 29,833.34 | 29,833 | 29,026 |
| Simpson | | | 1,475[3] | | 1,492 | 1,452 |
| Spafford | 20,186 | 22,509.39 | 19,004[3] | 31,109.36 | 31,109 | 30,268 |
| Spencer | | | 375[3] | | 379 | 369 |
| Stelk | 18,471 | 20,139.29[2] | 17,526 | 28,239.66 | 28,240 | 27,476 |
| Stricklin | | | 12,550[3] | | 12,699 | 12,356 |
| Williams | | | 525[3] | | 531 | 517 |
| Yarbrough | 9,386 | 14,133.39 | 7,390 | 15,196.97 | 15,197 | 14,786 |
| Total | $200,605 | $236,073.69 | | $311,339.30 | | |
| Total incl. Special Cases | $219,300 | $254,768.69 | $208,148 | $330,255.30 | $330,254 | $321,325 |

[1] including bonus

[2] correct figure; master's computations contain error

[3] stipulated

[4] including interest 7/1/80 to date

## REPORT OF SPECIAL MASTER

Too long ago, this Court appointed the undersigned as Special Master to determine the amount of the back pay award to each successful Claimant. So that the Court will not draw incorrect inferences from the lengthy interval, let me list the more important reasons for the delay, not necessarily in order of chronology or significance:

1) The failure to pay proper heed to Parkinson's Law—"Work expands so as to fill the time available for its completion";

2) A congenial—and necessary—accommodation by counsel and the undersigned to each of the others schedules;

3) Something of a fastidiousness for precise details and a compulsion toward absolute accuracy shared by all legal counsel and totally lacking in the undersigned;

4) A reluctance on the part of counsel to follow the lead of the undersigned—a reluctance soundly founded, we must add, on the correct perception that he had no real idea where in the world he was going; and

5) The nature of the beast—this is a matter better suited to the common-sense deliberation of the jury room subject to control of the Court, but one which the Title VII places exclusively in the Judge's lap.

In any event, counsel were fully cooperative in compiling the material facts in the Factual Basis for Report of Special Master (the "Basis") which, with its three accompanying exhibits ("Ex. BA," "Ex. CH" and "Ex. TX"), is being filed simultaneously herewith and will be referred to plenteously throughout. The following brief summary is given to explain what is the substance of the Basis and its accompanying Exhibits, hopefully in aid of the understanding of this Report.

### HEREIN OF THE FACTUAL BASIS

The Basis begins with an overview of Shop Rite's Dallas District during the early 1970's—from June 6, 1971, to June 6, 1975 (the "Relevant Period" or the "Period"). It then sets out the relevant facts as to each of the groups of male employees: The Supervisory Group, the Store Managers Group, the Assistant Managers' Group, and the Produce Managers' Group. The information as to the Supervisors is largely contained in resumes or work histories that comprise Exhibit A of the Basis. This group is much smaller, much more diverse in employment background, and much harder to generalize about than are the other three groups.

For each of the other three positions a "comparable" male group of employees was assembled for each job category. Initially the three groups consisted of all of the males who were promoted into that position during the Relevant Period. The parties then "bargained" exclusions from each group—largely because something about that individual's work history was aberrant (a series of promotions, demotions, military service breaks, etc.) They finally wound up with the three groups as contained on Exhibits B, C and D as comparable male groups for each of the three positions. A dispute as to how to handle males with "prior comparable experience"—Claimants seeking inclusion, Shop Rite exclusion—could not be resolved by the parties, but their respective positions and their dispute is memorialized in the Exhibits and the difference in each case can be quantified.

Each group is, thus, a very large sampling of Shop Rite's male employees in the three positions for the period involved. They are comparable to the Claimants and are useful in developing the median intervals for promotion for each managerial group. For each of the three positions, median and average salaries were developed for each year. Note that it makes very little difference which salary is used to compute back–pay awards—the average or mean produced about 50¢ a week more for managers' salary, and the median about 25¢ per week more for assistant managers and for produce managers, they produced the

same. Similar information was set out for bonuses paid to each group on a quarterly and annual basis.

As a part of the basis, it was agreed and noted that Produce Managers were on a different job track than were Assistant Managers–Managers. Only very rarely did any crossover occur.

For the Claimants, individual treatment was afforded special cases and then the bulk of the claimants were considered together. For this large group–paragraphs 33, 34 and 37 are crucial. Paragraph 33 sets out their claimed position, employment data with Shop Rite and their tenure at the beginning of the Relevant Period. Paragraph 34 sets out the annual wages earned by each Claimant at Shop Rite and 37 sets out every significant leave of absence during the Period.

As a part of the Basis, the parties agreed that there were no significant differences between fringe benefits provided to management and those enjoyed by the Claimants–therefore, such could be disregarded. Other than some economic information about interest rates and rates of inflation, the rest of the Basis describes the three Exhibits that accompany it. Exhibit BA, contains the Bonus Accrual information–except for the actual dollar amount of bonuses paid–for each of the three managerial positions for each quarter of the Relevant Period. A study of it can determine promotions or hirings into, and exits from, the three positions. Exhibit CH is just such a study. The three complex and necessarily messy charts–one for each position–form the basis for the six summaries that make up the front part of Exhibit CH. There are two such summaries for each position–one setting out information as to "Some" managers–those promoted during the Relevant Period–and one for "Other" managers, being the incumbents at the beginning of the period.

Exhibit TX contains copies of tax returns and other tax data for most of the Claimants.

In addition to this Factual Basis, there are some "non–factual" or at least "non–provable" bases, and some simplifying assumptions upon which this Report also rests–which, in candor, must be disclosed.

## HEREIN OF THE NONFACTUAL BASES

In deposing the economic expert, Dr. Swanson, Claimants' counsel articulated the task this Court set for the undersigned as well as can be done:

> . . . (The) objective is to award to each successful Claimant an amount of money which would compensate the Claimant for the economic loss she incurred as a result of the discrimination.

In undertaking this assignment and continuing until these words are written, I have entertained grave doubts about my ability to come close to understanding what that means–much less to do it.

For instance, I thought about what "the discrimination" means. It should mean the unlawful employment practices of Shop Rite that this Court has found occurred as they affected each of the Claimants–or at its broadest, it would still be limited to Shop Rite's employment practices as such affected women generally, including the Claimants. But how do you separate out the other types of discrimination–or at least sex–based differences–that have been visited by others than Shop Rite on females? Until July 3, 1965, in most places of the United States–in particular, Texas–it was not unlawful to refuse to hire, to refuse to promote or to refuse equal pay solely on the basis of sex. And discrimination did not cease automatically and everywhere but in Shop Rite's stores on July 3, 1965. The difficulties in isolating Shop Rite's unlawful discrimination and its effects are reflected in the Basis in the first four Exhibits. In Exhibit A–the synopsis of Supervisors' work history–every man (with one notable exception) had considerable pre–1965 managerial experience. In Exhibit B, C and D, the differences between the parties over inclusion into the "comparable" male group

were largely over treatment of those men with "prior managerial experience." Inclusion of males with "prior managerial experience" lowered the median tenure time for the Clerk to Assistant Manager progression by 3 months and by 1 month in each of the other two groups. As will appear below, I excluded "prior managers" across the board. None of the Claimants claimed comparable experience, and I do not believe that there existed a significant pool of prospective female employees with prior management experience. It is, of course, the fault of others than Shop Rite that its prospective female employees lacked such experience.

Secondly, in the context of this case, how does one get a handle on quantifying "economic loss?" Or defining it, for that matter. Most EEO cases involving back-pay awards with which I am familiar have involved "equal work-unequal pay," where the victim class did virtually identical-or at least comparable-work for less pay. It was not difficult there to conclude that the cents-or dollars-per hour difference should be awarded the victim class (although it seems just as reasonable to suppose that a "discrimination subsidy" boosted the favored class' wage over a true non-discriminatory, universal wage). Although it is clear some claimants were the functional equivalent of at least assistant manager, managing is still different than clerking-and being responsible is different from having responsibility. The Claimants did not have to pay the price in increased time commitments, mental preparation, emotional involvement, job insecurity away from a union contract, etc., that a managerial job demanded. So, if she has not made the "economic input"-although against her will and because of Shop Rite, admittedly-should she still get the full "economic loss" that the pay differential suggests?

Thirdly, more importantly along that line, how would anyone ever know if-much less to what level of competence-any one of the Claimants could manage, or assistant manage or produce manage? This problem was slightly alleviated by some Claimants that aspired no higher than assistant manager. But what of those who see themselves as capable of rising to the supervising level? How can any of the Claimants prove to me they can-or Shop Rite prove to me they can't? They can't, neither of them. Or at least I still don't see how they can-and I've thought long and hard about it.

This question of proof of managerial ability is but one incidence of twin-questions that were raised several places-who has the burden of proof and what effect is a lack of proof (usually because of impossibility). Another example is the "neither road taken" problem presented by the different tracks that the Assistant Manager and the Produce Manager followed-with sometimes widely different results under our methodology. The Claimants contend that all inferences should be drawn as strongly as possible against the discriminator-citing direct quotes from numerous authorities. Shop Rite counters that it remains Claimants' burden-despite the discrimination finding-and such burden is not met by piling inference on inference.

Here are a few other non-factual or at least non-provable factors that are somehow to be taken into account-even when explicitly ignored:

In computing back-pay awards, the methodology assumes that each Claimant worked the same time period after hypothetical promotion as she did as a Clerk, but promotion could have caused her to work longer for Shop Rite, quit sooner for a better job, or caused a fairly early firing.

A promotion-even if short-lived-may have a significant economic benefit, not equivalent to back-pay period income in terms of increased self esteem, job mobility, etc.

A firing or a demotion (which Claimants were "denied" by lack of promotion) may be

an economic disaster or a spur to greater economic productivity.

In short, I find it as difficult to predict the past as I do the future. And despairing of notion that what follows will be "right"– or can be–because of this host of assumptions that we have to make, I am willing to make a few more assumptions that appear reasonable to me–but more importantly sure make things simpler in an effort to achieve "rough justice" for the Claimants and for Shop Rite.

## SIMPLIFYING ASSUMPTIONS

There were two assumptions that Claimants agreed to at the outset–amounting to concessions on their part–the first of which greatly simplified putting together the Basis and this Report:

That the back–pay awards would be limited to the period–the "Relevant Period"– from June 6, 1971, to June 6, 1975. No Claimant sought the position of either Regional Manager or Meat Market Supervisor.

There are many other Simplifying Assumptions that I make–hopefully each explicitly done–throughout this Report. There are these few–however–that are of such crucial importance that they should be stated at the outset:

*The Basic Assumption*–The reliability of a crude form of Probability Theory that I find much easier to draw upon than to articulate. The notion is that our group of Claimants is large enough and our group of comparable males is certainly large enough (almost universal) and representative enough that we can get a fairly good picture of the experience of a typical or average Claimant, and the comparable male. Maybe a fuzzy picture, lacking in detail, but a good shot at reality anyway.

*The Corollary Assumption*–That this typical picture will not look like any real Claimant and cannot be used mechanically for any one Claimant, but should work quite well for the group of Claimants as a whole.

For example, five Claimants lay claim to a Supervisor's position–it is one thing to say that the odds are pretty good that one, two, maybe three Claimants could have reached that level than it is to say that Patricia Carter or Joyce Debord or both or neither would have been the one that did.

*The Damage Assumption*–I do not believe that there is any necessary relationship between what damages Shop Rite should–in fairness–be required to pay or what–in fairness–any one Claimant is entitled to receive. In other words, it makes as much sense–and is no harder to do (or no easier) to first determine how much Shop Rite should pay and then apportion it among the Claimants as it is to determine what each Claimant should get and then aggregate those amounts to determine what Shop Rite should pay. This has to be true with any exemplary damages that form a part of a Title VII recovery. If Discriminator is ordered to pay $100 exemplary, where is it written that each of the hypothetical Claimants must share on a *pro rata* basis rather than on an amount proportionate to their actual damages (i. e., total back pay award?) or on some other, perhaps more equitable, basis. And, if as has been held there is room for the equitable power of the Court to fashion Title VII relief, where is it written that those equitable powers are similarly circumscribed.

*The Consequent Assumption*–As a consequence of the three assumptions, I am further willing to assume that as long as the overall recovery is fair and the Claimants are treated fairly vis a vis each other, we don't have to agonize too long, or compute too finely.

*The Arbitrary Assumption*–Given the above assumptions and under the above constraints, I believe that a neutral other can play some type of God by making gross, even arbitrary assumptions as to the workings of that hypothetical world that is the subject matter of this lawsuit, just as long as he is as happy to slash at Shop Rite as he is to chomp on the Claimants. Which I am.

*The Unscrambling Assumption*–We proceed largely through discussion in the text and calculations or proof in the Appendices. Our whole structure is built upon the concept of a "Vanilla Back–Pay Award" which is developed in Appendix A. It shows for most of the Claimants–other than some special cases–what she would receive based on applying the median male tenures in her claimed position–other than Supervisor–to her time of employment at Shop Rite to determine her time in the particular managerial position and assuming automatic promotion after such time for those aspiring Managers. Next a differential between Clerk's wages and the position's salary is multiplied by the time in the position to get the actual back–pay. It is plain vanilla–without a time–use or interest factor or a tax factor and with no other adjustments or reductions. If the Court does not buy in whole or in part our recommendations then it will be easy to correct for the differences by using the figures in Appendix A and adding–or eliminating as the case may be–the nuts and the syrups.

## USE OF "AVERAGE CLAIMANT SALARY" CONCEPT

Another simplifying assumption I make at the outset in compiling Appendix A is that of the "Average Claimant Salary."

Paragraph 34 of the Basis sets out the actual weekly average salary for each Claimant for each year–at least insofar as such information could be reconstructed. Therefore, they are reasonably–but not absolutely–accurate. For most of the Claimants who worked an entire year without lengthy illness or other leave time, the figures approach complete accuracy quite closely. For Claimants who were ill, otherwise on leave, or who voluntarily or otherwise worked part–time, I am much less confident in the accuracy of any figures taken individually.

At least three things can be done with the Paragraph 34 figures. One, they can be used as they are presented to determine–by subtraction–the difference that Claimant would have earned in the particular manager's position. This penalizes the higher paid Claimants–who presumptively are the more dedicated, ambitious etc.–in relation to their lower paid counterparts. This unfairness is particularly noticeable when considered against the distribution of Paragraph 34's figures. See Appendix B for a study of claimants' salaries. Most of the Claimants most of the time fall in a narrow range at the top and the rest fall–not just below–but far below this range.

The second possibility is to develop an average or a minimum–for example, the bottom of the range referred to above or the mean–and apply it to bring those below it up to that level, but to use the actual figures for the higher paid Claimants. This is fairer than the first possibility because it does not reward accidental or habitual under–achievement. But it still penalizes by a loss of earnings the higher–paid Claimants. And it involves still a lot–though less–special calculations.

The fairer thing seemed to be to develop an "average" figure for each year as the salary for the position of Clerk and apply it to *all* Claimants. One, it's easier to calculate–much easier; particularly since I used a whole dollar figure for our "average." Secondly, it does not penalize the higher–paid Claimant. Thirdly it comports with what I perceive to be the relative rather than absolute, accuracy of the Paragraph 34 figures. And it does not provide a windfall to the higher–paid Claimants–although at first blush, it seems to. It must be remembered that the other figure involved in the subtraction process referred to above is the median for that managerial position, and there is reason to believe that the higher–paid Claimants would perform above the median (given the assumption that the Claimant group as a whole would perform identical to the median). Lastly, it's not too much hair off Shop Rite's hide–and it is actually much better for it than using the

actual wages for all Claimants. For example, a quick calculation showed that Ruth Brammer—the highest—paid Claimant—gets about $1,200 more (less than $8.00 a week) using the "average" than she would have had her actual figures been used. It reduces what 5 Claimants—three of them substantially—would get if their own actual figures were used; it makes less than $1.00 per week difference for 2 more and about $2.50 per week for the rest. As Joe Stephens observed about milk consumption for his 11 kids: "We spill more than that for breakfast."

The figures I developed for the "average" weekly Clerk's salary—by extrapolation from Paragraph 34 of the Basis—for each of the years are as follows:

| | |
|---|---|
| 1971 | $125.00 |
| 1972 | $130.00 |
| 1973 | $145.00 |
| 1974 | $160.00 |
| 1975 | $190.00 |

In each year there were two actual Claimants making the amount "developed" except 1974 when there was only one; there were at least twice as many below the "developed" amount in each year, again except 1974 when there were 6 above and 9 below (which indicates the fairness to Shop Rite of this composite approach). And it is in rounded numbers which are easier to use in computations. Finally, it compares well—surprisingly well assuming a little "filter-down" time—with the increases in the median weekly Store Manager's salary set out in paragraph 12:

| Annual Increase | | | | |
|---|---|---|---|---|
| | **1972** | **1973** | **1974** | **1975** |
| Clerk's "Average" | 4% | 11.5% | 10.34% | 18.75% |
| Manager's Median | 8.43% | 8.24% | 11.66% | 6.12% |

| Increase Over 1971 Base | | | | |
|---|---|---|---|---|
| Clerk's "Average" | +4% | + 16% | + 28% | + 52% |
| Managers' Median | + 8.43% | + 16.91% | + 30.54% | + 38.53% |

Given the abnormality of 1975 when Manager's revolved and clerks that wanted to could undoubtedly work overtime while their cohorts sought permanent employment elsewhere, this comparison reinforces the accuracy of the developed average figure for weekly clerk's salary. Finally, the reasonableness of the concept's use seems established by Appendix B.

## THE WEEKLY DIFFERENTIAL

The developed average weekly Clerk's salary can now be subtracted from the appropriate weekly salary to get the weekly differential for each position for easy year. For Manager, the "Median/Weekly" figures in Paragraph 12 were used—which are without bonus. For Assistant Manager, the "Median/Weekly" figure in Paragraph 16—again without bonus—were used. For Produce Manager a weekly bonus amount was determined by dividing the "Median/Quarterly" figure in Paragraph 21 by 13 (weeks per quarter) and this figure was subtracted from the "Median/Weekly" figure in Paragraph 20. The weekly differentials are, then, when rounded to the nearest whole dollar, as follows:

CLERK–STORE MANAGER DIFFERENTIAL

| Year | Clerk's Weekly | Manager's Weekly | Weekly Differential |
|---|---|---|---|
| 1971 | $125 | 206.84 | $82 |
| 1972 | 130 | 223.40 | 93 |
| 1973 | 145 | 241.81 | 97 |
| 1974 | 160 | 270.00 | 110 |
| 1975 | 190 | 286.54 | 96 |

CLERK–ASSISTANT STORE MANAGER DIFFERENTIAL

| Year | Clerk's Weekly | Assistant Manager's Weekly | Weekly Differential |
|---|---|---|---|
| 1971 | 125 | 178.47 | 53 |
| 1972 | 130 | 185.84 | 55 |
| 1973 | 145 | 193.21 | 48 |
| 1974 | 160 | 207.87 | 47 |
| 1975 | 190 | 225.00 | 35 |

CLERKS–PRODUCE MANAGERS DIFFERENTIAL

| Year | Clerk's Weekly | Produce Manager's Weekly | Weekly Differential |
|---|---|---|---|
| 1971 | 125 | 157.36 | 32 |
| 1972 | 130 | 165.65 | 36 |
| 1973 | 145 | 178.49 | 33 |
| 1974 | 160 | 197.98 | 38 |
| 1975 | 190 | 190.92 | 1 |

Despite the apparent absurdity of the last figure entered above, I adopt all of the above as the most reasonable figures available to determine differentials in weekly sal-

ary–without bonuses–among the various positions. They will be applied to develop the Vanilla Individual Back–Pay Award (the "Vanilla Award") for each Claimant.

## FUNCTION OF THE VANILLA INDIVIDUAL BACK–PAY AWARD

As stated, Appendix A computes a back–pay award for each Claimant (other than McDowell, Spencer, Simpson, Stricklin, and Williams) without taking into account any bonuses for each position she claimed and disregarding any supervisory position, i. e., anything above Store Manager. Remember that District Manager and Group/Produce Supervisor were the two supervisory positions sought by the Claimants.

The methodology used to compute the final figures for each Claimant is more fully described in the introduction to Appendix A; broadly stated it is a computation for each Claimant utilizing the concept of a median time for male employees for progression from position to position and the Claimant's actual employment history with Shop Rite, beginning frequently before the Relevant Period starts, but ending simultaneously therewith. It is the basis for the ultimate award to each of these Claimants–but the rest of this Report does make adjustments to those figures.

Most of the Claimants were treated as incumbents in one of the three managerial positions at the beginning of the Period. This stems directly from findings the Court has already made as to the turnover during the Relevant Period in Shop Rite's managers and which is easily observable from Exhibits TX and CH. I have made the assumption that the turnover in all three positions was similar from passage of Title VII to the beginning of the Relevant Period; in fact, turnover could have been much less and still have had the same results for our purposes: there would still have been plenty of openings for a Claimant to have filled shortly before, at or after she had served as long in position as the median male. Those Claimants who served through the median male tenure for promotion, became, under the theory, eligible for promotion at various times beginning as early as 1966. Such turn–over during the Relevant Period leads likewise to the reasonable conclusion that at the time within such Period a Claimant served through the male–tenure time, there would have been at least one, probably many openings available then or shortly thereafter (or before since it "averages" out). Consideration should be given to the stated presumption that between 42% and 50% of the Shop Rite work force was female and to the direction that such ratio guide the compiling of this Report. Shop Rite had 25 stores for the first couple of quarters, but 5 of them closed by or were closing in early 1972 when # 340 became part of the Dallas District. Thus, 20 stores were in operation the bulk of the Period. Seven Claimants, under our method, were deemed Managers for the entire period. One of the other eleven Claimants managed at the beginning of the Relevant Period, not at the end–and the other three au contraire. The minimum number of female Managers at any one time during the Period was 8, and for over half of the period, 10. This bumps pretty hard against the top of the Court's ratios. There is no similar problem with Assistant Manager or Produce Manager–and the bottom of the range is not approached if all those positions are combined.

## SUPERVISORY PROGRESSION

Only if the Court is willing to carry the Theory of Proportional Sexual Representation to the highest–i. e., the supervisory–level, is there anything to support taking supervisory pay or position into account in fashioning the back pay awards. While I am unwilling ultimately to make this assumption, I am willing to entertain it temporarily to see where it might lead. The Court found that at least 13 openings oc-

curred at all Supervisory levels except Regional Supervisor during the period it had under discussion which extended to 1977. From the resumes of supervisory personnel that make up Exhibit A it can be determined that at least the following vacancies occurred in the following supervisory positions:

*District Manager.* Sam Allen who was promoted to District Manager in August of 1970 was "terminated" (retired?) in April of 1972, and was replaced by James Spears, who served until the end of the year and assumed another Supervisory position. Buddy McCaghren, who replaced Spears, served apparently until January 1, 1975 when he was replaced by Bobby Smith. There were, thus, three openings in this position.

*District Produce Supervisor.* Doyle Stewart who entered this position in November of 1970, was terminated in April of 1972. Apparently this position was filled three months later by Jack Gates, who served until the end of the period. There was, thus, only one opening in this position.

*District Grocery Supervisor.* In September of 1971 McCaghren filled the position of grocery supervisor until promotion to district manager at the end of 1972. His successor was Allen Seale, who served the first 10 months of 1973 until he was terminated and replaced by Bobby Smith, who served until January of 1974 when he became Dallas District Manager. There were four openings for this position in the Relevant Period assuming that the position was not filled after Smith occupied it.

Thus, with women occupying about 42% of the work force then, under the Theory they would occupy about 42% of these positions—or fill about 42% of these openings. It would then be highly probable that at least one woman would have filled the District Managers position some time, and not improbable that a second one would and there is even some non-negligible probability that all three openings would have been filled by females. About the same could be said of Grocery Supervisor and the odds were only slightly less than even that the one Produce Supervisor opening would have been filled by a woman.

But which time would such position have been filled—early in the Relevant Period, at the very end? And more importantly, which woman or women? There are five women claiming supervisory positions—and whether the promotee would have been any of them and which of them—I cannot say. As mentioned, I made a study of Claimants' salaries, to see if somehow distinctions among those claiming Supervisor status could be made from that data—and concluded it could not. See Appendix B. Maybe the Court can make such determination from the record made by, among others, the testimony of those aspiring supervisors—or conclude all share equal or specified portions of the Supervisor's differential. If so, such differential in pay is readily quantifiable from the Basis and can easily be taken into account.

It was clearly less likely that any one of the Claimants would have been struck by lightning, than that she would have been promoted to a supervisory position had Shop Rite not discriminated. How much less likely I do not know, but do not think it likely enough so that a differential for supervisory pay—or even some proportion thereof—may be cranked into a back pay award. The other difficulty in dealing with the supervisory positions is there seems to be no way to generalize how long it would take—on the average—to reach the supervisory level. It was noted above that—with but one exception, all of the supervisors named in Exhibit A to the Basis had managerial experience prior to the effective date of Title VII. That one exception was the only one who got all of the way—Dale Turner, the regional supervisor.

The longest employment that any of the five Claimants to the Supervisory positions had with Shop Rite was Spafford who was

employed 4 years, 7 months at the beginning of the Relevant Period and 8 years 7 months at the end. Pugh's tenure was a half year shorter and Carter's 10 months. The other two—Stelk and Debord—had been employed by Shop Rite less than two years at the beginning of the Relevant Period. All of these tenures fall well below what is the average or median time interval from initial hiring to first supervisory promotion observable on Exhibit A.

Therefore, I recommend that no differential for Supervisor or District Manager pay be awarded any Claimant. I do that well aware of the magnitude of the pay differentials involved which may better than double any one Claimant's actual salary and would make a significant difference in the overall back pay award. But I do remember we have excluded Supervisor's salaries when it comes to adjustment made in awarding back–pay—one of the factors, in other words, we include although explicitly ignoring it.

## THE ROAD NOW TAKEN

Five of the Claimants included in Appendix A say they were willing and able to have been promoted to both Assistant Manager and to Produce Manager. As the Basis establishes, the two positions were on different tracks and were—with insignificant exceptions—mutually exclusive. Assistant Managers progressed to Managers and some to Supervisors or above. Produce Managers by and large remained Produce Managers with a few being promoted to the Produce Supervisory level and even fewer becoming Manager or Assistant Manager.

Neither the Claimants nor Shop Rite were able to tell how any particular Claimant was to be placed. The Claimants urge that whichever position would pay the particular Claimant more should be selected; Shop Rite disagrees, of course, but did not urge the opposite approach. The difference in individual cases are rather startling. Assuming enough time in Shop Rite's employ (and assuming "automatic" promotion to

Manager, and utilizing no "firing" factors) the Assistant Manager's track proves more profitable. But not all Claimants had enough time and for her promotion to Produce Manager at 6 months was preferable to waiting 14 months for the Assistant Clerk job.

The difference caused by the alternative tracks is quite significant. The maximum back pay awards for all of the 5 switch–hitters, if all were Assistant Managers–Managers, is approximately $77,000. If all were Produce Managers, the total is approximately $24,000. If all were promoted to their "best" position, the total is about $77,000; if all to their "worst", $23,000. This $50,000 swing represents approximately 25% of the Vanilla Awards for all Claimants.

In Appendix A, I have made the calculations for those Claimants both ways so that the effect can be quantified. For purposes of calculating the amount due any one of them, I have assumed promotion to the position that paid that Claimant more–and only thought about fudging once.

## BONUSES–MEDIAN, AVERAGE OR NONE

The median quarterly bonus paid to Managers and Assistant Managers was–for all except the two quarters in 1971–zero (See Paragraphs 13 and 17 of the Basis). If the median were strictly used, about $60 per month would be added to Manager's salary and less than $15.00 per month for Assistant Managers–for the first six months of the Relevant Period only. After that, the median adds zero to the salary of both positions. Spread over the entire period, the 1971 median bonuses would amount to about $7.38 per month for Managers for the entire 48 month period, and $1.66 per month for Assistant Manager. Average bonuses for these two groups was about $40.00 per month for the entire Period for Managers and about $10.00 per month for Assistant Managers–much of that coming in the first

ten months, i. e. 1971. Claimants now urge that an average, rather than a median, bonus be factored in, while Shop Rite is content here with the median. For these two groups, I recommend that bonuses be entirely disregarded. The reason appears in Appendix C which sets out an analysis of dollar payments of quarterly bonuses to all persons occupying each of the three positions. It shows that—except for probably the last of the Christmas bonuses in 1971—the lion's share of the bonus pot was at only three (frequently only two) stores—and they were generally the same stores ( # 333, 337 and 344 and sometimes # 335). These were the stores highly coveted by the managerial group and much fewer than average vacancies occurred in any of those stores during the Relevant Period. See Appendix D. For most of the Period, the Managers of the top three stores received better than 75%, sometimes 90%, once 100% of the Quarterly Bonus, and the same picture was substantially true for Assistant Managers.

For Produce Managers, bonuses were spread more across the board and the median and average (or mean) approached each other indicating a more normal distribution. There is some indication from comparing Produce Managers' bonuses with the other managers' bonuses on the one hand and with the Clerk–Produce Manager Differential on the other, that bonuses were a "normal" part of the typical Produce Managers' salary. Therefore, for Produce Manager only, I recommended taking Quarterly Bonuses into account, and would add in monthly in each year the following:

```
1971 $ 78.00 quarterly - $6.00 Weekly
1972 78.00 quarterly - $6.00 Weekly
1973 130.00 quarterly -$10.00 Weekly
1974 78.00 Quarterly - $6.00 Weekly
1975 52.00 Quarterly - $4.00 Weekly
```

These figures lie between the median and the average figures (see paragraph 21) and closer to the former. By the way the only effect this has is to add (without an interest factor) $605.00 to one Claimant's back pay, and $323 to the other's.

### FIRING AT WILL—OR WILLIE

There were a significant number of males promoted to, or hired as, Assistant Manager who were never promoted to Manager. In fact there was a not insignificant number who did not remain as Assistant Manager very long. Some of those who were "fired" fairly early on show up later promoted again to Assistant Manager—which leads to the inescapable conclusion that they could not hack it the first time up but themselves got the axe. There were a significant number of males who were promoted to, or hired as, Manager who did not hack it there for very long either; some were, as a matter of record, demoted to Assistant Manager or worse, but the fate of most was not a matter of record. Those promoted to Produce Manager, after an initial shake—out period, fared relatively better than either of the other groups (much better than Assistant Managers)—they found it easier to hack—or produce. But, as alluded to, a not—insignificant number of them do not appear very long in the Quarterly Bonus Accruals (Ex. BA).

Note that we do not know, and can not tell, the reasons for the departure of any particular male from Exhibit BA. Shop Rite's personnel records indicate "terminated" for some males, but that designation does not necessarily mean "fired" rather than "quit." It is reasonable to assume that a male who remains in position for only a month or two got fired. Under my simplifying assumption it does not matter—if a somewhat typical male would have been fired after 2 months it is no different from a somewhat typical male's quitting under the increased job pressure and firing himself. With enough random events—and we got nearly Shop Rite's entire universe of them—we can know what they all mean together without knowing for sure what any one means.

The question then is what to do with this hard, but troublesome data? The Claimants, for good reason, urge "Forget it." The stated rationale for this position is to the effect that we can never know how any of the Claimants—or any other females—would have done in the various positions because Shop Rite's wrongful discrimination denied them (and us) the opportunity.

Drawing the inference against Shop Rite,—we can say that all these females found qualified by the Court would have been—and stayed—promoted. And in the case of Assistant Managers, promoted on to Manager.

A supplemental argument is that combining any type of "tenure factor" with an assumption—which we do after a fashion employ—which utilizes the median male experience from periods prior to promotion sharply discriminates against the qualified female. We assume i) that it took each Claimant the identical length of time that it took the "median male" to obtain promotion, and further ii) that once promoted, she did not do better than some median, average or composite male. It may well be that the "below—average" male who made the median interval for promotion much higher, also had the bad tenure experience. The above—average female would beat him coming and going, in the real world, but is, under the double—assumption, severely penalized.

Another argument not made, but not implausible, turns on some assumptions (not unreasonable in light of the Court's findings) as to the skewed nature of Shop Rite's managerial force. Since Shop Rite did not promote qualified females, it filled some of its positions with unqualified (less qualified?) males and, of course, they were fired or quit fairly quickly.

Shop Rite counters with a rather common—sense observation based on the assumption of the equality of the sexes, namely, there is no reason to suppose that females, as a group, were better managers than males, so let's look to post—promotion experience of the males.

I agree with Shop Rite that this post—promotion male experience should be looked at, but I disagree with whose experience should be looked at and how that experience should be viewed (or used). First disagreement: Shop Rite takes as a comparable group only those male employees who filled a managerial position after the beginning date of the Relevant Period—in other words

it ignores the incumbents that filled positions on that date. Shop Rite's group, for each position, is the first of the two charts—the "Some Managers" charts—for each group contained in Exhibit CH. I believe this does violence to the Court's direction to reconstruct work histories from the effective date of Title VII, and, even worse, does equally as much violence to reality. There were incumbents in each position—particularly Manager and Produce Manager—that remained in position all or substantially all of the Relevant Period. Shop Rite's group ignores this stabilizing factor.

Worse, Shop Rite's group contains an unstabilizing factor by including those promoted during the last part of the Relevant Period. From even a cursory glance at Exhibits BA or CH, we can accurately say that they were playing "fruit basket turn—over" with the managerial positions at Shop Rite during late 1974 through mid—1975. More than one or two males became both Assistant Manager and Manager during this period—distorting the statistics for each group—and many more went through at least one of the then revolving doors. Appendix E corrects each of Shop Rite's "Some" Charts by combining it with the appropriate one of the "Other" Charts that are a part of Exhibit CH to pick up the incumbents at the beginning of the Period and to eliminate people hired in 1975. The result is that the "tenure time" for Assistant Manager is nearly doubled, and that for Manager and Produce Manager nearly tripled from that of Shop Rite's group. The median for remaining in each position after promotion, then becomes

| | |
|---|---|
| Manager | 87 Weeks |
| Assistant Manager | 41 Weeks |
| Produce Manager | 67 Weeks |

There is another study—Appendix F—which relates to these tenure charts. The result of that study are setting what amounts to rough odds as to the probabilities of tenure in a position stated in terms of what the chances were that a new manager would be "fired" (quit, etc.) before the specified time interval had elapsed. For

each position the rough odds can be stated as follows:

## ROUGH CALCULATION OF ODDS ON TENURE OF ASSISTANT STORE MANAGERS

1 in 10 2 months
1 in 10 5 months
1 in 10 8 months
1 in 10 1 year
2 in 10 1½ Years
4 in 10 Promoted

## ROUGH CALCULATION OF ODDS ON TENURE OF MANAGERS

1 in 10 3 months
1 in 10 6 months
1 in 10 10 months
1 in 10 1 year
1 in 10 2 years
1 in 10 2½ years
1 in 10 3 years
3 in 10 Managing Forever

## ROUGH CALCULATION OF ODDS ON TENURE OF PRODUCE MANAGERS

1 in 10 3 months
1 in 10 6 months
1 in 10 9 months
1 in 10 1 year
1 in 10 2 years
1 in 10 2½ years
1 in 10 3½ years
3 in 10 Produce Manager forever

In the next section, we shall attempt to take this experience into account.

## QUANTIFYING THE TENURE ODDS

For reasons stated and obvious, Claimants would urge that this experience evidenced by the Tenure Odds be disregarded: a) It's Shop Rite's fault that these Claimants did not get to prove themselves; b) each Claimant was found qualified for promotion and no evidence exists that she would have or should have been fired; c) there is no sensible, unarbitrary way of taking this experience into account. Shop Rite urges that the median tenure in position be used to limit the length of the back-pay period, and thus the back-pay

award, for any Claimant exceeding that number of weeks during the Relevant Period. But Shop Rite does not suggest that a Claimant who did not remain in Shop Rite's employ the entire median period should be paid, nonetheless, for the entire median period.

I believe that this experience should be taken into account, although in doing so, I am aware that action—admittedly arbitrary—is required, but I do not think doing so is unreasonable, but is more reasonable than not doing so would be.

The easiest way to demonstrate the effect that the male experience after promotion should have is to compare the tenure odds quoted for the male Managers as illustrated in the chart above, with what we assume to be our Claimants' experience when we calculated the Vanilla Awards in Appendix A.

There are 11 Claimants to the Store Manager position. By consulting Appendix A, we see that seven of them were assumed to have managed for the entire 4 year or 48-month period. The others (Brammer, Yarbrough, Debord and Inglet) managed from 16 to 38 months. If we eliminate one of the 48-month managers (an assumption which is more favorable to the Claimants than to Shop Rite) we have a group of 10 with tenures as follows:

```
Brammer 16 months
Yarbrough 28 months
Debord 32 months
Inglet 38 months
Maximum 48 months
 " 48 months
 " 48 months
 " 48 months
 " 48 months
 " 48 months

Total 402 months
```

A composite of the group of comparable males that were promoted to Manager looks about like this—a picture we take from our Rough Calculation of Odds:

```
Male #1 3 months
Male #2 6 months
Male #3 10 months
Male #4 12 months
```

| | |
|---|---|
| Male #5 | 24 months |
| Male #6 | 30 months |
| Male #7 | 36 months |
| Male #8 | 48 months |
| Male #9 | 48 months |
| Male #10 | 48 months |
| TOTAL: | 265 Months |

Let's assume—since its easier to think in dollar terms—that it is worth a differential of $10.00 per month to be a manager. Therefore our male group worked 265 months as Manager, and therefore it was worth $2,650 for the male group to have been manager. On the same assumption, the female group would have earned $4,020—or almost exactly 50% more (1.5 times as much) than the male group; or, the male group earned only 66⅔% of what the female group "earned"—or two-thirds less.

Our assumptions and generalizations mask two very crucial facts: it was the male group—from which our composite is roughly drawn—that did the actual managing and earning. It was that group that received the actual manager's salary—from which the actual clerks' salary that the women were paid was subtracted to get our differential (which we assumed to be $10 per month for simplicity's sake). Therefore, although a generalized composite, it is the male group that earned the *real* salary.

The notion then occurs that the salary of the female's group should equal the salary of the male group. Under our assumed situation, a one–third reduction for each of the females would bring the aggregate wages into line. But there is a fairer but far more complicated way: a reduction of each Claimant's award to correspond with the Rough Odds for male tenure. Consider Ruth Brammer with her 16 months: She had a 100% chance of working 3 months, only 90% of working the next 3, 80% for the next 4, 70% for the next 2 months and 60% for the last 4. To calculate:

```
3 months at $10 times 100% = $ 30
3 months at $10 times 90% = 27
4 months at $10 times 80% = 36
2 months at $10 times 70% = 14
4 months at $10 times 60% = 24
TOTAL: $ 131
```

This compares to the $107 that she would have gotten had there been an across the board reduction. The difference of course comes from the females with the longest tenure because they get only 30% of the last 12 months instead of 66⅔.

We had conceded at the outset that admittedly arbitrary action was necessary to take into account the male Odds on Tenure.

Much of the arbitrariness comes from the necessity of combining the Rough Odds with the median tenures that we have developed for our male groups in accordance with the Court's instructions. The other large contributing factor to the arbitrariness of any ultimate figures relates to the assumption we make that all Claimants who lay claim to the manager's position were promoted. In making the adjustments or reductions which I do below, I have followed principles which I believe do allow for proper inclusion of this post–promotion experiences of males. First, there will be no reduction for a period in each position which is equal to the median tenure for males in that position—with an important exception for Assistant Managers after promotion to Manager during the Period. Second, the initial period for any Claimant in which there is no reduction begins coincident with the beginning of the Relevant Period, or with the promotion during that Period of that Claimant; in other words, not at the actual time of promotion for those Claimants deemed to have been promoted prior to the start of the Relevant Period. Without this bit of arbitrariness, most Claimants who are deemed incumbent Managers would draw 50% pay for the entire Period—or they were half fired before they got started. Third, the biggest bite should come out of the latter months, as illustrated by our example of the incremental reduction to Ruth Brammer in contrast with the across the board reduction. Fourth, I have shifted the odds toward the claimant group in order to roughly take into account i) exclusion of supervisors position and pay from the Vanilla Award, ii) exclusion of bonuses for Assistant Managers and Managers, iii) limiting back–pay awards for the Relevant Period when there

were three stores (or about ⅐th of 20 stores) that stayed open much longer, and iv) the fact that Shop Rite's discrimination caused the problem in the first place and denied Claimants the chance to prove themselves. Fifth, I tried to reconcile the assumption of automatic promotion to Manager of our Claimants with the male experience that approximately one–half of the Assistant Managers were never promoted by taking a fairly large chunk out of the Manager's pay after the initial 87 week period. She would have no reduction for nearly her first two years as Manager, and then a steep reduction after that. Sixth, I used 52 week intervals–one year–after the initial median intervals for each group because it somewhat simplified the calculations and reduced the possibility of error. Lastly, no reduction greater than 50% for any period was allowed. In other words, with all this, what I am attempting to do is to turn the "Rough Calculation of Odds"

tables upside down, figuratively speaking, as we did when we compared the male group and the Claimants group above while reconciling it with the use of male tenures.

This Probability Theory could be used alone–without regard to male tenure experience. Sample population for males in each position is nearly universal: and was truly representative–having been formed by the bargaining of two adversaries under supervision of a neutral observer (who can confirm each group's representativeness). Used alone, the Probability Theory would undoubtedly result in an aggregate back–pay award to all Claimants of less than under the above assumptions–particularly the 50% limit on reductions and the 88 month Manager's tenure. See Appendix G.

For those Claimants not promoted through the Assistant Manager's position, I make the following reductions:

### Assistant Manager

| | |
|---|---|
| 0 - 41 Weeks | No reduction for that period |
| 42 - 93 weeks | 25% reduction for that period |
| 94 -145 weeks | 40% reduction for that period |
| 146 weeks + | 50% reduction for that period. |

### Produce Manager

| | |
|---|---|
| 0 - 67 Weeks | No reduction for that period |
| 68 - 120 weeks | 20% reduction for that period |
| 121 - 172 Weeks | 30% reduction for that period |
| 172 weeks + | 40% reduction for that period |

### Manager

| | |
|---|---|
| 0 - 87 weeks | No reduction for the period |
| 88 - 139 Weeks | 40% reduction for the period |
| 140+ weeks | 50% reduction for the period |

For a Claimant who was both Assistant Manager and Manager for back–pay purposes, she was first treated like other Assistant Managers, in other words there was a 25% reduction applied to the interval between 41 weeks (end of the median male tenure in that position) and 78 weeks (at which time she is deemed promoted). After promotion, she is treated as we considered treating Ruth Brammer above, to the point where the 40% reduction occurs; the 50% reduction occurs after she is Manager for 139 weeks which treats her like the Managers who were incumbent at the beginning of the Period:

```
 Promoted Manager

 0 - 13 weeks No reduction for that period

 14 - 26 weeks 10% reduction for that period

 27 - 43 weeks 20% reduction for that period

 44 - 52 weeks 30% reduction for that period

 53 -139 weeks 40% reduction for that period

 140+ weeks 50% reduction for that period
```

---

As an Appendix to this Report we calculate a back–pay award for each Claimant based on this Methodology. See Appendix H. Prior to making those calculations we developed an appropriate interest factor to include in the calculations and considered income tax effects. The next two sections are concerned with those matters.

## THE APPROPRIATE INTEREST FACTOR

Claimants urge–forcefully and persuasively–that an additive over and above a traditional interest factor should be applied to any wage differential to compensate for the loss of the use of the money over the period which has included two periods of double digit inflation bridged by a period marked by inflation that was itself tolerable only by comparison.

Dr. Swanson testified that both an inflation factor and a "time use of money" factor would be needed to give equivalent value, i. e., purchasing power, today for dollars withheld years ago. Her figures for the appropriate inflation factor were based on the Consumer Price Index–Wage Earner Series for the Dallas–Fort Worth Urban Areas (the "CPI"). This is the most appropriate gauge to measure the effect of inflation on the back–pay award in this case. She adds to that a 3% interest factor, compounded quarterly, to compensate for the use (or the denial of the use) of the money over the time period. She notes that the CPI does not include interest costs and bases her 3% factor as being in the 2% to 4% range that "a lot of complicated" studies seem to indicate is in the nature of a "pure" interest rate free of the complicating factor of inflationary expectations. Dr. Swanson's methodology and numbers (adjusted with the CPI figures for February and May, 1980) are appropriate and useable for purposes of both an inflation and an interest factor.

But, I see no rationale for allowing Title VII Claimants entitled to back–pay awards to be treated any differently from any other type of judgment creditor. Until Milton

Friedman's Index becomes the measuring rod for all Federal Courts' (or Texas) judgments, pre–judgment interest only should be added to augment the back–pay award.

Claimants were paid weekly. Although it is something of a *non sequitur*, I developed a factor to compound the 6% interest factor to approximate weekly compounding in order to give some accounting to weekly pay periods. From the standard S tables, it was determined that a 6% quoted rate compounded bi–monthly (24 times per year) is 6.175704%. A 6% rate compounded daily on a 365 day year is quoted by financial institutions as 6.1831%. The actual decimal for weekly compounding was not obtainable or calculable by me, but, 6.18% is accurate, to the decimal point given.

In terms of dollar impact to the Claimants and to Shop Rite, the difference between the 6.18% compounding factor and Dr. Swanson's inflation and time/value factors is of a similar magnitude to the reductions proposed in the preceding section. By way of comparison, her method would require that approximately $2.20 be paid for each $1.00 not paid at the beginning of the Period and $1.65 for each $1.00 not paid at the end while the comparable figures for the 6.18% compounding factor are approximately $1.71 and $1.34.

The standard formula was utilized for compounding:

$$S = P(1+i)^n$$

where $P$ = the principal amount,
$n$ = number of years,
$i$ = the interest rate (6.18%) and
$S$ = the compounded amount.

Thus, the factors to obtain a compounded amount to July 1, 1980, from a date in the year in which the principal becomes payable are different powers of 1.0618 (1 + 6.18%) as follows:

| Year | Exponent (n) | Factor |
|---|---|---|
| 1971–72 | 8 | 1.61563 |
| 1973 | 7 | 1.52159 |
| 1974 | 6 | 1.43303 |
| 1975 | 5 | 1.34963 |

A point in each year was picked on which the entire amount of that year's back–pay award was deemed to be due and owing for purposes of computing interest; that point was the mid–point of the particular period. Thus, for example, if the period were the entire portion of the Relevant Period during 1971 the mid–point was September 18, 1971, and if it were all of such Period for 1975, the mid–point was March 19. For the three whole years, it was coincidentally and conveniently July 1st. If a Claimant worked only a portion of a year, the mid–point was calculated from the mid–point of that year anyway to simplify computation, since the differences are minute. For some of the special cases a particular due date for the award was stipulated; the same methodology was used beginning on such date. Interest from the anniversary date in 1979 or 1980 (other than July 1) was obtained by multiplying the compounded amount by 6.18% and multiplying that product by a fraction, the numerator being the number of days from the last anniversary date of the mid–point and the denominator being 365. That same calculation can be used to bring interest current to Judgment Day.

## THE INCOME TAX
## EFFECT–DISREGARDABLE

Back–pay awards are clearly includable as income to the recipient in the year of actual receipt, assuming the taxpayer to be on a cash basis, which all Claimants undoubtedly were–and deductible by Shop Rite as a business expense. See Rev.Rul. 72–341, 1972–2 C.B. 32; IRS Letter Rul. 7720011, February 7, 1977. The progressive nature of the federal income tax and the requirement of annualized returns combined to create a theoretical difficulty in taking into account the receipt of a large lump–sum payment in one year which should have been spread out over several earlier years. Before we turn to that problem, there are subsidiary issues that must be addressed.

First, I have concluded–but do not herein seek to advise Shop Rite in such matters–

that Shop Rite is required to withhold from the Claimants back–pay award in accordance with the Code provisions. And IRS makes no distinction between the "back pay" and the "interest" portion of the award. At least that is the position of the IRS under stated factual situations indistinguishable from ours. See Rev.Rul. 78–176, 1978–1 C.B. 303 and Rev.Rul. 72–341, 1972–2 C.B. 32. But if the withholding is done on the basis of an annual payroll period, the percentage withheld varies from 15% to an estimated maximum of 28% to 30% and will closely approximate actual taxes. And–again without advising Claimants that they can or should do so–they may claim excessive deductions and lower withholding to approximate the actual tax effect. At worst, excess withholding is only a timing problem because upon filing a return for the year of receipt of the back–pay award, the Claimant will get the benefit of such withholding either as a credit against taxes otherwise due on the return, or as a refund. So there is no big problem here, other than the loss of interest on the amount of the excessive withholding, if any.

The Social Security or FICA taxes deserve at least brief mention before being ignored since these amounts have been held subject to that tax for both employees and employers. If the Claimants had received the back–pay award during the Period, they would have had to pay FICA tax on the amount received each year. They, thus, have a benefit of having avoided the increased tax, but they have suffered a corresponding detriment in not having credits to their Social Security account built up. I do not think it is a significant problem either way, and would conclude that paying the employers' and the employees' portions of the FICA tax in the year of receipt of the lump–sum award will substantially even things out. I finally note that the payment also appears to be subject to the Unemployment Tax and for withholding there. But that is minimal and would have been due when received anyway.

Now for the biggie: The toll taken by the talons of the tax collector, i. e., the effective tax bite, which varies, of course, from individual to individual, from year to year, and from amount to amount; in other words, there are unique tax problems for each Claimant. To make tax calculations with even the precision that H & R Block requires, is a formidable undertaking–and unnecessary. Despite individual differences, there are some important characteristics that are general to all Claimants, notably the following:

In the Beginning–If a Claimant had received the additional income during the various years of the Relevant Period, such additional income would have been subject to Federal Income Tax at that particular individual's incremental effective tax rate. Therefore, we assume initially that she would not have had that taxed portion of the additional income, and such portion would not then be subject to increase by the compounding interest factor.

In the Interim–The increase caused by the annual compounding is income and subject to tax–but only when received, and not in the interim.

At the End–Claimant gets in one tax year and lump sum that is completely includable as taxable income on which she has to pay a tax and at a higher incremental rate–supposedly–at least for those receiving large lump sum distributions, that would have been true if received in various tax years.

One court has stated–without explaining why–that since the Claimants would have had to have paid tax upon receipt of the money and in the year the back–pay award accrued, they would not have had the use of the tax portion of the award and so that portion should not be subject to increase by a time–money factor. Although that sounds plausible, on closer examination it seems to make less sense. Shop Rite owed the Claimant the money–whether the Claimant was in a zero tax bracket or a 70% tax bracket. In the second place, allowing Shop Rite not to pay the money to the

claimant allows Shop Rite to keep the money and get the use of the money over the years and thus confers a benefit on Shop Rite.

And, thirdly, the court there did not recognize the problem of what happens to the Claimant who receives a large lump sum award in one year which should have been paid out over annual tax periods and is presented with a tax bill on that amount. This was something that was of great concern to counsel to the Claimants.

In attempting to grapple with the income tax problem, I learned that the tax rates in effect for the years including 1971 through 1975 were identical. The standard deduction from year to year varied, but, fortunately, only slightly, and the personal exemption increased from $675.00 in the first year to $750.00 thereafter. All of the Claimants were roughly in the same effective tax brackets–from 19 to 22% for most and up to 25% for a few (assuming a working husband who made as much as 2 times as much as the Claimant–which was true for the 1976–79 years as Exhibit TX shows). Thus, it seemed possible to do a fairly rough, but fairly accurate calculation which would be applicable to all of the back–pay years to determine what amount would have gone to taxes, and should, under the authority above referred to, be excluded.

Then it was further observed that the tax rates now in effect for the year 1980 are *lower* than they were for the back–pay years, the personal exemption deduction is higher ($1,000.00), and while the concept (or the lingo) has been changed, the "zero bracket amount," which roughly corresponds to the "standard deduction," is larger.

This–and five–year income averaging–lead me to hope that the percentage that was taken out of the back–pay award would somewhat approximate the amount that would have to be added back on to provide Claimants with the funds to pay taxes in the year of receipt–and could,

therefore, be ignored. In other words, if you take a quarter out of any dollar in the back–pay year so as to avoid compounding tax dollars, but you also have to add back the quarter for every compounded dollar to allow for taxes, then you've computed much but accomplished little. Example: Back–pay year: $1.00 earned; 25¢ due in tax; net, 75¢. Compounding factor: 2. Total back–pay award, $1.50, taxable at the 25% rate; so 37.5¢ must be added. But that 37.5¢ is also taxable at the 25% rate, so that's another 9.475¢, which is taxable at ETC. Pretty soon you've put back in the whole 50¢–or the original quarter compounded by 2.

My hope was realized.

I requested tax data from all Claimants for the years 1976 through 1979, and received such data from most of them. I also received some data from earlier years from some claimants including, most notably, Betty Spafford, who provided returns or partial returns from 1971 through 1979, and wrote in an estimate of 1980 income for herself and her husband.

After looking at all of the data in Exhibit TX and thinking about it for awhile, I picked Ruth Brammer as the easiest example to compute a claimant with a possible significant tax problem and picked Betty Spafford as the Claimant most likely to be severely affected by the timing problem with the tax laws. Spafford's husband–with whom she files jointly–has always earned 1.5 or 2 times–even 2.5–as much as she has, and they have been in a consistently high bracket. On the other hand, Brammer is single, with one exemption deduction (herself), and utilized a standard deduction for every year for which we had a tax return for her. Therefore, I annualize Brammer's weekly salary–beginning with 1972 when she became first entitled to back–pay per paragraph 34 of the Basis and came up for the four back–pay years involved for her with the following salaries:

| | |
|---|---|
| 1972 | $ 6,776 |
| 1973 | 7,984 |

| | |
|---|---|
| 1974 | 9,020 |
| 1975 | 10,106 |

To those I added the Vanilla Award calculated for each of those four years:

| | |
|---|---|
| 1972 | $1,430 |
| 1973 | 2,496 |
| 1974 | 5,720 |
| 1975 | 2,208 |
| Total: | 11,854 |

Then I got from Exhibit TX her "Adjusted Gross Income" for the years 1976 through 1979 which were as follows:

| | |
|---|---|
| 1979 | $9,105 |
| 1978 | 2,909 |
| 1977 | 6,835 |
| 1976 | 9,662 |

For 1980 I assumed a $9,500.00 gross income for her from her job, to which I added the $11,854. Two tax returns were prepared for each of the four years she should have received back–pay and for 1980, the year of assumed receipt of the lump sum, the first return assuming she had received her back–pay in the proper years, and the second assuming she received a current lump sum payment. These calculations are set out in Appendix I. The Tax Differential column shows the amounts "saved" in taxes for the former back–pay years, and the extra amount paid in 1980, which surprisingly was less. In other words, in the looking glass world of the Internal Revenue Code, Brammer, made $530.00 by getting the lump sum award.

Note that the above prototypical or simplified picture did not include the time–use of money factor for the money and Brammer's income for the back–pay years was, to a large extent, hypothesized. Besides, it dealt with a single Claimant and most of our Claimants are married, filed joint returns, their husbands usually make at least, sometimes more than they do, and as everyone knows under our present tax structure, married people get what they got married to get.

Enter Betty Spafford–the worst case. The actual figures from her 1971–1979 returns for gross income, were obtainable from Ex. TX. I had not requested entire returns, so, we assumed (worst case) that the Spaffords used only the standard deduction; to the extent that all itemized deductions exceed that amount, and their total income indicates clearly that it would, then the tax differences would be lessened. In any event, the computations were done as described above, again omitting the "time use of money factor"—and they do wind up paying $1,260 more because of the receipt of the lump sum amount–and on our worst case assumptions; the reduction of the Vanilla Award for her will proportionately reduce those tax dollars. This is a relatively small amount of their total tax bill– about 4% of either $35,875 or $34,615–for the 5 years involved. Note that the Spaffords' problem stems chiefly from the high income tax bracket they were in for the year 1976–79 which made averaging of little benefit–$156 for them compared to $764 for Brammer. We then tried to take into account the interest factor for the Spaffords. She has to pay a tax on the amount of the interest in the year of receipt–assumed to be 1980. Remember if she had received the back pay when due, she would not have earned the interest, would have had no interest income, and have no tax on that interest. The most sensible thing is to ignore the tax on the interest amount. But to quantify this factor, if you spread out some roughly hypothetical earnings equal to the total amount of interest over the years from 1972 to 1980, you find that the difference in the tax on the interest alone is not significant. And they are no different in that respect from any other judgment creditor receiving a lump sum award including prejudgment interest. All the calculations for Spafford are also found in Appendix I.

Aside from the little practical difference either way, I continue to maintain that Shop Rite owed the gross wage in the back pay year regardless of Claimants' tax bracket–and it should now pay the gross award whether Claimant has lived off disability or tax shelters on the one hand or the sweat of her brow on the other. Therefore, I have concluded that the federal income tax should be ignored going in and coming out. This is not to say that many of

the Claimants will not face a substantial tax on receipt of the award—it is to say that the Government would have gotten just about as much on the installment plan.

RECOMMENDED AWARDS (SOME)

Over one–third of the Claimants–seven of the eighteen–will have no better than 10% of the Total recovery–no matter how the pie is sliced. The other 11 are those that lay claim–whether disjunctively or solely–to at least the position of Manager. Those 11–and 90% of the Dollars–can and should be treated as a group. Before we get to them, we look at the "little seven."

*Brown: Produce Manager.* She is the only Claimant who lay claim solely to Produce Manager. Her recommended back–pay award is calculated at the end of Appendix H. Her Vanilla Award from Appendix A was adjusted for the percentage reduction, bonus additives and the interest factor discussed above for Produce Manager

and more fully explained in Appendix H. For her, I recommend a total award as of July 1, 1980, of $8,390.

*Of Lamb and Leaves.* All of the Claimants to the Assistant Manager position–whether on the way through the Manager's position or not–were affected slightly by the adoption of the 14–months progression from Clerk to Assistant Manager rather than 11 months. It appeared from first look at Appendix A that Lamb was devastated by it. Had we adopted the 11–month progression, she would have been promoted to Assistant Manager in May, 1973, two months before the break in service and could have come back as an Assistant Manager. And, rather ironically, she would have made Manager in 1975 when the door was revolving for male managers.

If we assume the 11–month progression for her, her first entry on Appendix A now looks like this:

```
Lamb I a) Ass't Manager 5/5/73 to 5/24/75 1973-23 48 1,104
 (Leave of absence: 1974-34 47 1,598
 5/11/74 - 9/14/74) 1975-21 35 735
 (Not employed from
 7/9/73 - 9/28/73)

 b) Manager 5/24/75 to End 1975- 2 96 192

 TOTAL: $3,629
```

The spread sheet with reductions and interest factor for her for each progression are as follows:

CLAIMANT: LAMB

Position(s): Assistant Manager/Manager

| Weeks Ea.Yr. | Weekly Diff. | % Allowed | Basic Back Pay | Interest Factor | Total |
|---|---|---|---|---|---|
| 1973-23 | 48 | 100% | $1,104 | 1.52159 | 1,680 |
| 1974-18 | 47 | 100% | 846 | 1.43303 | 1,212 |
| 1974-16 | 47 | 75% | 564 | 1.42202 | 808 |
| 1975-21 | 35 | 75% | 551 | 1.34963 | 743 |
| 1975- 2 | 96 | 100% | 192 | 1.34963 | 259 |
| | | Back Pay: | $3,257 | Grand Total | $4,702 |

CLAIMANT: LAMB

Position(s) Produce Manager

| Weeks Ea.Yr. | Weekly Diff. | % Allowed | Basic Back Pay | Interest Factor | Total |
|---|---|---|---|---|---|
| 1972-4 | 36 | 100% | 144 | 1.61563 | 233 |
| 1973-41 | 33 | 100% | 1,353 | 1.52159 | 2,059 |

| Weeks Ea.Yr. | Weekly Diff. | % Allowed | Basic Back Pay | Interest Factor | Total |
|---|---|---|---|---|---|
| 1974-22 | 38 | 100% | 836 | 1.43303 | 1,198 |
| 1974-12 | 38 | 80% | 365 | 1.43303 | 523 |
| 1975-23 | 1 | 80% | 18 | 1.34963 | 25 |
| | | Back Pay: | $2,716 | Grand Total: | $4,038 |

To be added to the Produce Manager's grand total is the $684 in bonuses that she would have earned–$1031 with interest–making her total for this portion $5069.

I recommended treating Lamb as a Produce Manager (that is as will appear, a favor) and recommend a total award for her, as of July 1, 1980, of $5,069.

*Marie Stricklin: Meatcutter.* Paragraph 28 through 30 of the Basis relate to Marie Stricklin whose store was transferred into the Dallas District in April, 1968 at which time and, I think, for eons earlier, she was in Shop Rite's employ. She sought only the position of "meat cutter" rather than "meat wrapper," yet Appendix B demonstrates that she was at the top of the average salary scale, ahead of many who aspired to managerial or supervisory levels. Further, she remained a Piggly Wiggly Meat Wrapper until September 30, 1977, when she apparently retired (See Exhibit TX). As paragraph 29 points out, there was an impossibility of proof as to openings as Apprentice Meat Cutter, the first step above Wrapper toward Journeyman–except as to the one opening that is set out in the quote of the Court's finding in Paragraph 28 of the Basis. An opening that Stricklin could have occupied only under promise of being laid off. This was shabby treatment indeed for what appeared to have been one of the most conscientious, hard–working and humble of the Claimants. From what we know, it seems reasonable that there was at least one opening some time in the 6–year interval between her transfer into the District and the January, 1974, opening. For lack of a better assumption as to when such opening occurred, I assume at the mid–point between April, 1968, and January, 1974, or September 1, 1971, and that she then filled an opening for Apprentice Meat Cutter. If it took her two months more than the minimum of "at least two years" (Paragraph 30) to progress to Journeyman, then it would make no difference in her hourly pay whether she ever became Journeyman or not. I assume it took her the 2 years 2 months and assume a 40 hour week which is probably a minimum for her. Therefore, she is entitled–based on the pay differentials in Paragraph 28 of the Basis– to the following:

| Weeks Each Year | Hourly Pay | | | Total Back Pay | Total With Interest |
|---|---|---|---|---|---|
| | Wrapper | Apprentice | Difference | | |
| 1971- 9 | 2.98 | 3.793 | .8130 | $ 292.68 | $ 493.28 |
| 1971- 8 | 3.38 | 4.268 | .8880 | 284.16 | 478.20 |
| 1972-17 | 3.38 | 4.268 | .8880 | 603.84 | 975.58 |
| 1972-20* | 3.73 | 4.668 | .9380 | 750.40 | 1,212.37 |
| 1972- 9 | 3.98 | 5.018 | 1.038 | 373.68 | 603.73 |
| 1973-17 | 3.98 | 5.018 | 1.038 | 705.84 | 1,073.99 |
| 1973-26 | 4.23 | 5.318 | 1.088 | 1,131.52 | 1,721.71 |
| 1973- 9 | 4.23 | 5.480 | 1.25 | 450.00 | 684.72 |
| 1974-17 | 4.23 | 5.480 | 1.250 | 850.00 | 1,218.08 |
| 1974-26 | 4.43 | 5.680 | 1.250 | 1,300.00 | 1,862.94 |
| 1974- 9 | 4.63 | 5.880 | 1.250 | 450.00 | 644.86 |
| 1975-23 | 4.63 | 5.880 | 1.250 | 1,150.00 | 1,579.35 |
| | Back Pay Total | | | $8,342.12 | 12,548.81 |

(*Leave of absence from June 4 to July 16, 1972)

I recommend for her a total award, as of July 1, 1980, of $12,550.

*Rosemary McDowell: Part–Time Clerk.* McDowell was found by the Court to have been denied full–time permanent employment as a Clerk. She was employed for one year during the Relevant Period (June 10, 1974, to June 6, 1975). Had she worked full time, she would have been promoted to Produce Manager for purposes of the back-pay award after her first six months based on the median male tenure. This presents a theoretical difficulty. It seems wrong to grant a part–time employee the same assumptions as to promotions granted full–time employees, and yet to give part–time employees an additional amount between what they actually earned and what they would have earned on a full–time basis in the promoted position. In McDowell's case, she has been found to have been discriminated against on the basis of her sex in not being offered full–time employment. That does not answer the question whether or not, vis–a–vis other full–time female employees, she was also subjected to some type of unfair treatment or whether she was less qualified than a full–time female employee. While being unable to do anything but speculate as to that, I am unwilling to allow a part–time employee–here only McDowell–anything other than the higher of (a) what she would have made as a full–time clerk over what she actually made, or (b) the difference between Produce Manager and the average Claimant's salary developed above–but not both. Obviously, since the differential had narrowed for most of 1974, and was only $1.00 during 1975, McDowell is better off with the difference between what she would have earned as a full–time clerk, over what she actually made on a part–time basis. Therefore, she will be al-

lowed this amount. For her first six months of employment, she would have been entitled to receive $2.75 per hour. Assuming a 40–hour work week for the 26 week period, she would have received $2,860.00 had she been employed full time. For the second six months she would have received $2.90 an hour for 40 hours a week for 26 weeks, or $3,016.00 in back pay. From the total of these figures–$5,876–is deducted her actual earnings of $3,323. Since the mid–point of her pay period would be January 1, 1974, I applied the 1974 interest factor to the back–pay award, (1.43303 × $2,553) and added interest (3,659 × 6.18% divided by 2 = $113) for the six–month period between January 1, 1980, and July 1, 1980. Therefore, the total award for McDowell, as of the latter date is $3,770.

I note for the Court's benefit that had the additional $1.65 hour differential (see Exhibit E) between Retail Clerk and Produce Manager been cranked into the formula for McDowell, then she would have earned an additional $66.00 per week, or $1,716.00 in back–pay, or a total of an additional $2,460.00.

*Claimants Williams, Spencer and Simpson.* With the reservation of Shop Rite as to its rights to challenge liability, the parties have agreed to damages for Williams and Simpson, and have, in substance, done so for Spencer. As to Spencer, they agree she got a total of $131.04 gross wages for a month, and she was terminated September 21, 1974. If these factors are combined with the Court's finding of liability and that it took two months for her to find another job, her back–pay award becomes $262.08 due November 21, 1974. Therefore, for the three claimants, the total to be awarded is to be determined as follows:

| Claimant | Due Date | Back Pay | Interest | Total |
|----------|----------|----------|----------|-------|
| Williams | September 1, 1973 | $346.20 | 175.36 | 521.56 |
| Spencer | November 21, 1974 | 262.08 | 104.87 | 366.95 |
| Simpson | June 1, 1975 | 1,081.20 | 385.43 | 1,466.63 |

I recommend total awards—as of July 1, 1980,—for Williams of $525; Spencer, $375 and Simpson, $1,475.

## RECOMMENDED AWARDS (THE REST: PARTS I AND II)

The aggregate of the Vanilla Awards for the 11 other Claimants is $192,278.00.

I have in times past designated such as "Maximum" rather than "Vanilla" Awards. But there are at least two assumptions made under the Appendix A methodology that shows that, in theory, this is not the "maximum":—

No additive was cranked in for a Supervisor's Differential (i. e., it was assumed no Claimant advanced above the Manager level).

The back—pay period was limited to 208 months while three stores stayed open and owned by Shop Rite after June, 1975. And except to the extent that the whole award may be punitive, there is no provision for exemplary or punitive damages.

For the reasons discussed above—chiefly the "double promotion" and the "non–firing factor" or the "doubled non–firing factor," since each of the 11 Claimants was assumed not to have been fired as either Assistant Manager or Manager—I believe the Vanilla Awards are significantly in excess of what the 11 Claimants as a group could have obtained in a "real world."

The awards do represent what a group of "female managers" might well have looked like during a 208 month period (remembering we have Brown and Lamm as our female representatives in the Produce Managers' group):

| Month 1 | 7 Incumbent Managers |
| | 2 Incumbent Assistants |
| Month 10 | 8 Managers |
| | 2 Assistants |
| Month 13 | 9 Managers |
| | 1 Assistant |
| Month 14 | 9 Managers |
| | 2 Assistants |
| Month 17 | 10 Managers |
| | 1 Assistant |
| Month 29 | 9 Managers |
| | 1 Assistant |
| Month 31 | 10 Managers |

That is—collectively—a distribution within the limits (as we noted, just barely) set by the Court in its order. If we wish to let our 11 Claimants be the "proxy" for the whole group of Shop Rite female employees, then the Vanilla Award makes sense as a collective amount.

Even then there is a problem, one Aristotle recognized as fundamental: Distributive Justice. Is it really "right" that Yarbrough—whom we "promoted" before the period began—gets a Manager's salary for the 102 weeks she worked while Brammer whom we "promoted" during the period gets a Manager's salary for only 75 of the 208 weeks she worked during the period, and an Assistant Manager's salary for 78 weeks, and nothing for the other 55. On the basis of Exhibit A, Brammer worked twice as long for her $11,854 as Yarbrough did for her $9,386.

Exhibit H represents the best accommodation I could come up with · under the assumptions and constraints set out in the text and in the first part of the appendix. At one point, I was willing to conclude that it was "fair." It is still in the range of fairness—to Shop Rite, not to the Claimants *inter sese.* But I feel of it now as Auden said Melville later thought of *Moby Dick,* that it was "intricate and false/The truth was simple." And the next line follows: "He sat down to write a book."

## MAKING BOOK AND CONTINUED RECOMMENDATIONS (PART III)

The aggregate of the Vanilla Award for the 11 other Claimants is $192,278.00.

I propose a game of 11 players with our goal a maximum pot of $192,278.00. But first, I propose an example (fitting Carter, or Decker or Spafford) of one of the 11 players who won the individual maximum ($20,186). Here's what happens if we assume that our player was promoted to Manager—not Assistant Manager—on June 6, 1971, and not after or before, and that she worked as long as she actually did, i. e., the whole period, all 208 weeks. We then apply the Manager's Rough Odds table to her:

| | | | |
|---|---|---|---|
| 1971-13 | 82 | 100% | $ 1,066 |
| 1971-13 | 82 | 90% | 959 |
| 1971- 3 | 82 | 80% | 196 |
| 1972-14 | 93 | 80% | 1,042 |
| 1972-19 | 93 | 70% | 1,237 |
| 1972-29 | 93 | 60% | 1,618 |
| 1973-23 | 97 | 60% | 1,339 |
| 1973-26 | 97 | 50% | 1,261 |
| 1973-3 | 97 | 40% | 116 |
| 1974-23 | 110 | 40% | 1,012 |
| 1974-29 | 110 | 30% | 957 |
| 1975-23 | 96 | 30% | 662 |
| | | TOTAL: | $11,465 |

Her Vanilla Award is now $11,465 or 56.7% of the $20,186 "individual maximum." In other words, there is a reduction of 43.3%. Do that three times and those three Claimants have "lost" $11,465 each and Shop Rite has "saved" $34,395.

Now we must complicate things by bringing in the other ten (or eight) players, and start with the Clerk position and promote through the Assistant Manager group. Just as we assumed Carter was being appointed to Manager as the Period began, we will assume that, as our more complicated game starts, all 11 Claimants are just being appointed to Assistant Manager. But first, a general over-view.

This is a board game—with movement much more like Parcheesi than anything else—except that a player gets a fraction of the goal each move she is allowed to make, rather than all of it when she arrives at "home." In other words, there is no heaven, just money. And we are not going to use dollars, but our own "play money" in this case known as a "WIMS" (the "Weekly Interpolated Manager's Salary). Each Claimant who works one week as Manager earns one WIMS. Each Claimant who works one week as Assistant Manager earns a half—WIMS, and when she works the other week, she has earned a whole WIMS.

A "move" is working a week and earning either a WIMS or a half WIMS. A player is retired from the game when she can no longer manage, or assistant manage. On retirement, her total WIMS are put in the pot to be aggregated with the WIMS for the other ten players at the game's conclusion. The starting line, or "home" or "go" has all 11 players ready to move into their first week after promotion to Assistant

Manager. The game's objective is for all 11 players as a group to come as close as possible to (or as far as possible from, too) equalling "par," which is the maximum number of WIMS earnable. Perfectly played, the 11 players would work 78 weeks or 18 months as Assistant Manager (earning 11 x 78 ÷ 2 or 429 WIMS) and then each be promoted to Manager and serve the rest of the 208 week—period as Manager (earning 11 x 130 or 1,430 WIMS). Par is thus 1,859 WIMS.

And, of course, you roll the dice to see how far each player moves and for how long. Two ten—sided dice are used, the first die tells how long the player was Assistant Manager and whether or not she was promoted. By the way, I let the first die tell me that promotion to Manager occurred 6 out of 10 times, not just 4. The second die tells how long she served as Manager, but it is not consulted unless the first die promoted her. I played the game four times (really six, but I threw out the high and the low). For the four games played, the 11 players aggregated 819 WIMS, 1,175 WIMS, 1,013 WIMS and 734 WIMS, or, expressed as a percentage of the perfect score of 859 WIMS, they were 44.06%, 63.21%, 54.49% and 39.48%, for an average of 50.31%. See Appendix J.

In the Vanilla Awards, we assume i) each Claimant worked all of the weeks required to move from Assistant Manager to Manager without being fired, ii) that she was promoted to Manger, and iii) served the maximum time as Manager without being fired. Our game made the same assumptions in setting par at 1,859 WIMS.

Our results show us we are half—right. As a third recommendation—and my preferred one—I would reduce the aggregate Vanilla Awards to the group by 40%—or from $192,278 to $115,367.

Then I would portion out that amount among the Claimants on a percentage based on the weeks worked during the Period and the average weekly salary of the Claimants as set out in Appendix B. The basic notion is that such is exactly the way people get

paid, and we should assume that that is the way they get paid. I believe the "track record" that each Claimant compiled by her average weekly salary during the Period deserved to be taken into account in order to make some distinction among the Claimants and the awards. The "weeks worked" is the harder factor to determine. Do we go with Appendix A's methodology, and therefore, with the Brammer–Yarbrough disparity discussed above? Do we go with the length of employment at Shop Rite of each Claimant, regardless of its relationship to the Period? Do we go with the actual weeks worked during the Period for each Claimant regardless of any hypothetical promotion or promotions? I think historical accident should be given some effect, but should not be allowed the disparity that strictly following Appendix A creates. Therefore, the actual weeks worked during the Period will be used with a reduction of one–third for those weeks worked as an Assistant Manager, and a two–thirds reduction for those worked as a Clerk. This reduces the 208 weeks Brammer worked to 145 (75 plus two–thirds of 78 plus one–third of 55) and Debord's 208 to 185 (139 plus two–thirds of 69), and Stelk's 208 to 191 (156 plus two–thirds of 52). For the rest it is as set out in Appendix A. Here are the recommended shares:

| | Weeks | Wages | Share |
|---|---|---|---|
| Brammer | 145 | $155.75 | 7.88% |
| Carter | 208 | 146.28 | 10.62 |
| Debord | 185 | 144.88 | 9.35 |
| Decker | 208 | 147.97 | 10.74 |
| Dunafan | 196 | 148.41 | 10.15 |
| Inglet | 166 | 147.99 | 8.57 |
| Massey | 188 | 126.17 | 8.28 |
| Pugh | 200 | 131.12 | 9.15 |
| Spafford | 208 | 150.63 | 10.93 |
| Stelk | 191 | 151.31 | 10.08 |
| Yarbrough | 102 | 119.27 | 4.25 |

(The aggregate of the products of the above weeks times wages was $286,586, and was the divisor used to produce the "share.")

Finally, as I apply that percentage to the $115,367, I also apply a composite interest factor of 1.51322. This factor is derived from the annual figures set out above. The 1971 figure (1.61563) was added to the 1975 figure (1.34963), and that sum was halved to get one figure which was added to the figure for the other three years for the average. There were a total of 52 weeks in 1971 and 1975—1971 had more weeks (29), but 1975 had a larger Manager's differential, three more Managers and two less Assistant Managers working than did 1971, so it is just about equal. The total award for the 11 is $173,870; for each Claimant, the following:

| | |
|---|---|
| Brammer | $13,700 |
| Carter | 18,465 |
| Debord | 16,257 |
| Decker | 18,674 |
| Dunafan | 17,648 |
| Inglet | 14,901 |
| Massey | 14,396 |
| Pugh | 15,909 |
| Spafford | 19,004 |
| Stelk | 17,526 |
| Yarbrough | 7,390 |

By the way, WIMS gives us a method of testing the effect of limiting the Claimants to the median time worked for males in each position. If the three Claimants—Brammer, Debord and Stelk—who were Assistant Managers could have earned an Assistant's salary for only 41 weeks, they would have worked 123 weeks, or have earned 62 WIMS between them. If all 11 were limited to 87 weeks as Manager, they would work 957 weeks, or earn 957 WIMS. The total WIMS is, thus, 1,017, which is 54.7% of the possible, 1,859, or another 5% reduction over that proposed above.

## WHY FORTY PERCENT; AND WHY NOT?

And that is the question, or maybe two questions, that I can't answer, unless, as I hope, I have done so herein.

Perhaps the questions should be asked differently:

What is the distribution, mean and standard deviation of the results of two consecutive events, the first producing equally possible results of 8, 21, 35, 52, 78, 78

and 78*, 78*, 78* or 78* (which are halved for purposes of aggregating with results of the second event), and the second event occurring only if the first event produces a 78*, and with the equally possible results of the second event being 8, 16, 27, 33, 65, 81, 98, 130, 130, or 130?

Let's ask a simpler question: Changing the odds significantly to favor Claimants and focussing in on first one Claimant, what are the possibilities that she can both be promoted to Manager (when the odds are 5 in 10, or 1 in 2 either way) and serve the maximum term as Manager (with odds again of 1 in 2)? She has a 25% chance: 50% the first time multiplied by 50% the second, or 25%. One in four to us commoners. What are the chances both Claimant A and Claimant B will both i) be promoted to Manager, and ii) serve the max. The answer is not so common anymore, but it's 1 in 16 ($4 \times 4$ or $4^2$). And the odds diminish in exponents of 4 for every Claimant added. In other words, $4^{11}$ for our 11 Claimants. Which is also $2^{22}$. Which is also 1 in 4,194,-304.

The third most favorable assumption as to some Claimants–second most to a few–is that she would have been promoted into the universe of Assistant Manager and/or Produce Manager–this is the assumption the Court's order makes. The second most favorable assumption to a majority of the Claimants is that promotion–admittedly delayed, but automatic–from Assistant Manager to Manager occurred. The most favorable assumption to each member of the whole Claimant class is that once she is promoted, she stays promoted (unless promoted again). This Report makes all of those assumptions. The percentage reduction, based on the calculated Tenure Odds, is a correction of the unjust results those assumptions would otherwise mandate.

## CONCLUSION: ALL'S WELL THAT ENDS

Ripley tells of a Seventeenth or Eighteenth Century German who wagered one night in a tavern that he could turn a deck of cards in a certain way. He spent most or all of the rest of his life shuffling and turning. I am not that fool. Descartes was asked by a friend how he should bet a certain poker hand. While I think it was too late to help with that particular hand, Descartes answered the question by inventing Calculus. I am not that fool either.

I hope this report is not idiotic play; I have no pretension that it approaches Cartesian perfection. Where on that continuum it is, is now a matter for someone else's judgment.

SIGNED this 3rd day of July, 1980.

(s) John A. Martin
SPECIAL MASTER

## APPENDIX A

### VANILLA INDIVIDUAL BACK–PAY AWARD

Set out below for most of the Claimants– excepting those special cases–are calculations which establish what was described in the report as the "Vanilla Back–Pay Award."

The basis for the information as to the "Position(s)" is taken from Paragraph 33 of the Basis. The information in the "Time in Position" column is based upon the "Dates of Employment," etc., and the "Tenure at 6/6/71" columns of Paragraph 33, and on median male tenures. The median male tenures are as set out in exhibits B, C and D of the Basis, for each position I excluded those males with "prior experience" in calculating the median. Therefore, the times for progression from position to position are as follows:

Clerk to Produce Manager–6 months

Clerk to Assistant Manager–14 months

Assistant Manager to Manager–18 months

As can be seen, most of these Claimants had already passed through all of the calculations to either Manager or Produce Manager at the time the Relevant Period began. For some calculations were necessary. For example, Brammer had one month tenure at 6/6/71 so her time for progression to Assistant Manager was 13 months from the

date (14 months from her date of employment). And so she became Assistant Manager on 7/1/72 and served in that position 18 months until promotion to Manager.

The "Weeks Each Year" column sets out the total number of weeks in the indicated year that the particular Claimant would have been in the indicated Managerial position. This number of weeks is the adjusted figure taking into account the stated leaves of absence, which were taken from paragraph 37 of the Basis. The "Weekly Diff." column is the particular differential for that year between the indicated managerial position and clerk. The "Due W/O Adj." column is the product of the number of weeks and the weekly differential. The total "Vanilla Award" is given for each Claimant and in the case of those Claimants to both Produce Manager and Assistant Manager/Manager positions, two totals are given.

| Claimant | Position(s) | Time In Position | Weeks Each Year | Weekly Diff. | Due W/O Adj. |
|---|---|---|---|---|---|
| Brammer | a) Ass't Manager | 7/1/72-1/1/74 | 1972-26 | 55 | 1,430 |
| | | | 1973-52 | 48 | 2,496 |
| | b) Manager | 1/1/74 to End | 1974-52 | 110 | 5,720 |
| | | | 1975-23 | 96 | 2,208 |
| | | | TOTAL | | 11,854 |
| Brown | Produce Manager | 6/6/71 to End | 1971-29 | 32 | 928 |
| | | | 1972-52 | 36 | 1,872 |
| | | | 1973-52 | 33 | 1,716 |
| | | | 1974-52 | 38 | 1,976 |
| | | | 1975-23 | 1 | 23 |
| | | | TOTAL | | 6,515 |
| Carter | Manager | 6/6/71 to End | 1971-29 | 82 | 2,378 |
| | | | 1972-52 | 93 | 4,836 |
| | | | 1973-52 | 97 | 5,044 |
| | | | 1974-52 | 110 | 5,720 |
| | | | 1975-23 | 96 | 2,208 |
| | | | TOTAL | | 20,186 |
| Debord | a) Ass't Manager | 6/6/71-10/6/72 | 1971-29 | 53 | 1,537 |
| | | | 1972-40 | 55 | 2,200 |
| | b) Manager | 10/6/72-6/6/75 | 1972-12 | 93 | 1,116 |
| | | | 1973-52 | 97 | 5,044 |
| | | | 1974-52 | 110 | 5,720 |
| | | | 1975-23 | 96 | 2,208 |
| | | | TOTAL | | 17,825 |
| Decker I | Manager | 6/6/71 to End | 1971-29 | 82 | 2,378 |
| | | | 1972-52 | 93 | 4,836 |
| | | | 1973-52 | 97 | 5,044 |
| | | | 1974-52 | 110 | 5,720 |
| | | | 1975-23 | 96 | 2,208 |
| | | | TOTAL | | 20,186 |
| Decker II | Produce Manager | 6/6/71 to End | 1971-29 | 32 | 928 |
| | | | 1972-52 | 36 | 1,872 |
| | | | 1973-52 | 33 | 1,716 |
| | | | 1974-52 | 38 | 1,976 |
| | | | 1975-23 | 1 | 23 |
| | | | TOTAL | | 4,539 |

| Claimant | Position(s) | Time In Position | Weeks Each Year | Weekly Diff. | Due W/O Adj. |
|---|---|---|---|---|---|
| Dunafan I | Manager (Leaves of Absence: 3/3/72-4/19/72; 3/9/74-4/15/74; 1/22/76-3/22/76) | 6/6/71 to End | 1971-29 | 82 | 2,378 |
| | | | 1972-45 | 93 | 4,185 |
| | | | 1973-52 | 97 | 5,044 |
| | | | 1974-47 | 110 | 5,170 |
| | | | 1975-23 | 96 | 2,208 |
| | | | TOTAL | | 18,985 |
| Dunafan II | Produce Manager (Leaves of Absence: same as above) | 6/6/71 to End | 1971-29 | 32 | 928 |
| | | | 1972-45 | 36 | 1,620 |
| | | | 1973-52 | 33 | 1,716 |
| | | | 1974-47 | 38 | 1,786 |
| | | | 1975-23 | 1 | 23 |
| | | | TOTAL | | 6,073 |
| Inglet I | Manager | 4/72 to End | 1972-39 | 93 | 3,627 |
| | | | 1973-52 | 97 | 5,044 |
| | | | 1974-52 | 110 | 5,720 |
| | | | 1975-23 | 96 | 2,208 |
| | | | TOTAL | | 16,599 |
| Inglet II | Produce Manager | 4/72 to End | 1972-39 | 36 | 1,404 |
| | | | 1973-52 | 33 | 1,716 |
| | | | 1974-52 | 38 | 1,976 |
| | | | 1975-23 | 1 | 23 |
| | | | TOTAL | | 5,119 |
| Lamb I | Ass't Manager (Leave of absence: 5/11/74-9/14/74) (Not employed from 7/9/73-9/28/73) | 3/28/75 to End | 1975-10 | 35 | 350 |
| | | | TOTAL | | 350 |
| Lamb II | Produce Manager (Leave of absence same as above) | 12/5/72 to 7/9/73 9/28/73 to End | 1972-4 | 36 | 144 |
| | | | 1973-41 | 33 | 1,353 |
| | | | 1974-34 | 38 | 1,292 |
| | | | 1975-23 | 1 | 23 |
| | | | TOTAL | | 2,812 |
| Massey | Manager (Leaves of Absence: 5/5/72-8/1/72; 8/1/73-10/1/73) | 6/6/71 to End | 1971-29 | 82 | 2,378 |
| | | | 1972-40 | 93 | 3,720 |
| | | | 1973-44 | 97 | 4,268 |
| | | | 1974-52 | 110 | 5,720 |
| | | | 1975-23 | 96 | 2,208 |
| | | | TOTAL | | 18,294 |
| Pugh | Manager (Leave of Absence 2/25/74-4/22/74) (Terminated from 4/23/75-10/75 and reinstated with back pay | 6/6/71 to End | 1971-29 | 82 | 2,378 |
| | | | 1972-52 | 93 | 4,836 |
| | | | 1973-52 | 97 | 5,044 |
| | | | 1974-44 | 110 | 4,840 |
| | | | 1975-23 | 96 | 2,208 |
| | | | TOTAL | | 19,306 |
| Spafford | Manager | 6/6/71 to End | 1971-29 | 82 | 2,378 |
| | | | 1972-52 | 93 | 4,836 |
| | | | 1973-52 | 97 | 5,044 |
| | | | 1974-52 | 110 | 5,720 |
| | | | 1975-23 | 96 | 2,208 |
| | | | TOTAL | | 20,186 |

| Claimant | Position(s) | Time In Position | Weeks Each Year | Weekly Diff. | Due W/O Adj. |
|---|---|---|---|---|---|
| Stelk Ia | Ass't Manager | 6/6/71 to 6/6/72 | 1971-29 | 53 | 1,537 |
| | | | 1972-23 | 55 | 1,265 |
| Stelk Ib | Manager | 6/6/72 to End | 1972-29 | 93 | 2,697 |
| | | | 1973-52 | 97 | 5,044 |
| | | | 1974-52 | 110 | 5,720 |
| | | | 1975-23 | 96 | 2,208 |
| | | | TOTAL | | 18,471 |
| Stelk II | Produce Manager | 6/6/71 to End | 1971-29 | 32 | 928 |
| | | | 1972-52 | 36 | 1,872 |
| | | | 1973-52 | 33 | 1,716 |
| | | | 1974-52 | 38 | 1,976 |
| | | | 1975-1 | 1 | 23 |
| | | | TOTAL | | 6,515 |
| Yarbrough | Manager (Leaves of absence: 8/30/71-11/1/71; 3/27/73-6/17/73) | 6/6/71-10/20/73 | 1971-20 | 82 | 1,640 |
| | | | 1972-52 | 93 | 4,836 |
| | | | 1973-30 | 97 | 2,910 |
| | | | TOTAL | | 9,386 |

## APPENDIX B

### STUDY OF CLAIMANT'S AVERAGE SALARY

Sometime ago I made a "Study" of the salaries actually earned by the Claimants with the following in mind:

It was thought that the salaries actually earned by the Claimants could provide some indication of their comparative or relative i) ambitions or economic aspirations, ii) dedication to, or availability for their work, and iii) perhaps even competence.

That study did lead to some broad conclusions, while not being nearly conclusive on the above points. But it did lead to proof of the fairness in the use of the Average Claimant Salary Concept—in fact it lead to its development—and is worth replicating for that purpose alone.

The results set out below were obtained by the methodology to be described and based on the salaries in Paragraph 34 of the Basis and on the leaves of absence in Paragraph 37. For the eight Claimants who worked all of the Period without leaves of absence, I multiplied the weekly salary for 1971 by 29, for 1975 by 23, and for the three whole years by 52, then divided the sum of these products by 208—the weeks in the Relevant Period. For the other four, a similar average was obtained; based on actual weeks worked, as shown in the Basis with three exceptions. The 1972 and 1973 figures for Massey and the 1971 figures for Yarbrough looked way out of line. I suspect these three figures were obtained by dividing the total W-2 wages for the particular year by 52—which was fine most of the time. I corrected them by first multiplying by 52 then dividing by the weeks worked with leaves of absence figures in. For Massey the new figures are $96.25 and $110.94 and for Yarbrough $97.58. Still way low—but a little more in line. The results:

| Claimant | Claimed Position | Average Weekly |
|---|---|---|
| Brammer | Manager | $155.75 |
| Stelk | Supervisor | 151.31 |
| Spafford | Supervisor | 150.63 |
| Brown | Produce Manager | 149.73 |
| Dunafan | Manager | 148.41 |
| Inglet | Manager | 147.99 |
| Decker | Manager | 147.97 |
| Carter | Supervisor | 146.28 |
| Debord | Supervisor | 144.88 |
| Pugh | Supervisor | 131.12 |
| Massey | Manager | 126.17 |
| Yarbrough | Manager | 119.27 |

If you annualize the Average Claimant's Salary in similar fashion, it equals $147.19.

Just for fun, I calculated Stricklin's salary, who sought only the meat cutter position. She had an average of $149.01. Even given the fluctuating hourly difference that generally favored meat wrapper over clerks, that still says a little something about her.

It does show that—on this limited basis—the five who sought Supervisor were indistinguishable from the rest.

## APPENDIX C

## ANALYSIS OF BONUSES

I had furnished to me—and still have in my files—a handwritten takedown of the Quarterly Bonus Accruals, essentially the same information as in Exhibit BA or CH—except that it had, for the most part, the actual dollars paid to each of the managers who earned a bonus in any quarter.

Under my supervision and direction—and to my satisfaction—I had an analysis prepared of these specific payments. It was done in a "rough and dirty" fashion and except for a spot-check or two here and there, I have not verified its complete, literal accuracy. It need not be 100% correct—just approximately accurate for the uses to which I wish to put it. It does graphically point out the position that I saw emerge when I pored over the material from which the analysis was prepared.

A review of the analysis for each of the three positions supports the general conclusions stated in the section of the Report dealing with bonuses.

One word about the methodology. The total number in the "Distribution" represents the total number of people in that particular managers slot for that particular quarter—not the number of stores. I will bet that for 95% of the time for all three positions the total number showing in Distribution is greater than the number of stores. Turnover again.

## ANALYSIS OF BONUSES

### A. MANAGERS

#### Third Quarter 1971

Total Amount: $4,909.92

Range: $25.58 to $1,127.34

Top 3 Stores: 2,616.31 or 53%

| Distribution: | | | |
|---|---|---|---|
| $1,200+ − 0 | $ 700+ − 0 | $200+ − 3 |
| 1,100+ − 1 | 600+ − 0 | 100+ − 4 |
| 1,000+ − 0 | 500+ − 2 | 50+ − 2 |
| 900+ − 1 | 400+ − 0 | 1+ − 2 |
| 800+ − 0 | 300+ − 1 | 0 −11 |

#### Fourth Quarter 1971

Total Amount: $8,867.76

Range: $65.00 to $1,362.80

Top 3 Stores: $3,738.85 or 42%

724

| Distribution: | $1,200+ - 2 | 700+ - 1 | 200+ - 2 |
|---|---|---|---|
| | 1,100+ - 1 | 600+ - 0 | 100+ - 3 |
| | 1,000+ - 0 | 500+ - 2 | 50+ - 1 |
| | 900+ - 0 | 400+ - 2 | 1+ - 0 |
| | 800+ - 0 | 300+ - 4 | 0 - 6 |

### First Quarter 1972

Total Amount: $4,759.84

Range: $2.69 to $1,495.00

Top 3 Stores: $3,684.12 or 77%

| Distribution: | $1,400+ - 1 | 800+ - 0 | 200+ - 1 |
|---|---|---|---|
| | 1,300+ - 0 | 700+ - 0 | 100+ - 0 |
| | 1,200+ - 1 | 600+ - 1 | 50+ - 2 |
| | 1,100+ - 0 | 500+ - 0 | 25+ - 1 |
| | 1,000+ - 0 | 400+ - 0 | 1+ - 2 |
| | 900+ - 1 | 300+ - 0 | 0 -13 |

### Second Quarter 1972

Total Amount: $2,390.81

Range: $1.02 - $952.98

Top 3 Stores: $1,741.42 or 73%

| Distribution: | $1,200+ - 0 | 700+ - 0 | 200+ - 2 |
|---|---|---|---|
| | 1,100+ - 0 | 600+ - 0 | 100+ - 1 |
| | 1,000+ - 0 | 500+ - 0 | 50+ - 0 |
| | 900+ - 1 | 400+ - 0 | 1+ - 2 |
| | 800+ - 0 | 300+ - 2 | 0 -16 |

### Third Quarter 1972

Total Amount: $1,243.88

Range: $13.83 to 418.62

Top 3 Stores: $989.27 or 80%

| Distribution: | 500+ - 0 | 200+ - 0 | 25+ - 0 |
|---|---|---|---|
| | 400+ - 2 | 100+ - 2 | 1+ - 1 |
| | 300+ - 0 | 50+ - 1 | 0 -20 |

### Fourth Quarter 1972

Total Amount: $2,635.16

Range: $781.29

Top 3 Stores: $1,931.80 or 73%

| Distribution: | $1,200+ - 0 | 700+ - 2 | 200+ - 1 |
|---|---|---|---|
| | 1,100+ - 0 | 600+ - 0 | 100+ - 2 |
| | 1,000+ - 0 | 500+ - 0 | 50+ - 2 |
| | 900+ - 0 | 400+ - 0 | 1+ - 1 |
| | 800+ - 0 | 300+ - 1 | 0 -11 |

## First Quarter 1973

Total Amount: $3,399.60

Range: $48.39 to $943.83

Top 3 Stores: $2,139.98 or 63%

| Distribution: | $1,200+ - 0 | 700+ - 0 | 200+ - 0 |
|---|---|---|---|
| | 1,100+ - 0 | 600+ - 1 | 100+ - 1 |
| | 1,000+ - 0 | 500+ - 2 | 50+ - 1 |
| | 900+ - 1 | 400+ - 0 | 1+ - 1 |
| | 800+ - 0 | 300+ - 1 | 0 -13 |

## Second Quarter 1973

Total Amount: $1,726.64

Range: $108.78 to $739.96

Top 3 Stores: $1,617.86 or 94%

| Distribution: | $1,200+ - 0 | 700+ - 1 | 200+ - 1 |
|---|---|---|---|
| | 1,100+ - 0 | 600+ - 1 | 100+ - 1 |
| | 1,000+ - 0 | 500+ - 0 | 50+ - 0 |
| | 900+ - 0 | 400+ - 0 | 1+ - 0 |
| | 800+ - 0 | 300+ - 0 | 0 -17 |

## Third Quarter 1973

Total Amount: $1,782.32

Range: $39.73 to $363.38

Top 3 Stores: $1,379.21 or 77%

| Distribution: | $ 500+ - 1 | 200+ - 0 | 25+ - 1 |
|---|---|---|---|
| | 400+ - 1 | 100+ - 0 | 1+ - 0 |
| | 300+ - 2 | 50+ - 0 | 0 -15 |

## Fourth Quarter 1973

Total Amount: $3,270.75

Range: $58.79 to $862.86

Top 3 Stores: $1,856.33

Distribution: $1,200+ - 0 700+ - 0 200+ - 2
 1,100+ - 0 600+ - 1 100+ - 1
 1,000+ - 0 500+ - 0 50+ - 1
 900+ - 0 400+ - 0 1+ - 0
 800+ - 1 300+ - 3 0 -13

### First Quarter 1974

Total Amount: $2,553.31

Range: $103.59 to 856.82

Top 3 Stores: $2,248.39 or 88%

Distribution: $1,200+ - 0 700+ - 0 200+ - 1
 1,100+ - 0 600+ - 0 100+ - 1
 1,000+ - 0 500+ - 1 50+ - 0
 900+ - 0 400+ - 0 1+ - 0
 800+ - 2 300+ - 0 0 -17

### Second Quarter 1974

Total Amount: $2,150.99

Range: $90.47 to $705.18*

Top 3 Stores: $1,337.41 or 62%

Distribution: $1,200+ - 0 700+ - 1 200+ - 3
 1,100+ - 0 600+ - 0 100+ - 2
 1,000+ - 0 500+ - 0 50+ - 1
 900+ - 0 400+ - 0 1+ - 0
 800+ - 0 300+ - 1 0 -16

### Third Quarter 1974

Total Amount: $2,202.03

Range: $225.13 to $592.25

Top 3 Stores: $1,474.71 or 67%

Distribution: $ 500+ - 2 200+ - 3 25+ - 0
 400+ - 0 100+ - 0 1+ - 0
 300+ - 1 50+ - 0 0 -21

### Fourth Quarter 1974

Total Amount $2,427.87

Range: $8.79 to $737.10

Top 3 Stores: $1,752.37 or 72%

Distribution: $1,200+ – 0 700+ – 1 200+ – 1
 1,100+ – 0 600+ – 1 100+ – 2
 1,000+ – 0 500+ – 0 50+ – 0
 900+ – 0 400+ – 0 1+ – 3
 800+ – 0 300+ – 1 0 –15

### First Quarter 1975

Total Amount: $521.30

Range: $40.40 to $218.20

Top 3 Stores: $521.30 or 100%

Distribution: $ 500+ – 0 200+ – 2 25+ – 1
 400+ – 0 100+ – 0 1+ – 0
 300+ – 0 50+ – 0 0 –18

B. ASSISTANT MANAGERS

### Third Quarter 1971

Total Amount: $1,152.85

Range: $3.36 to $179.57

Top 3 Stores: $499.62 or 43%

Distribution: $ 500+ – 0 200+ – 0 25+ – 1
 400+ – 0 100+ – 4 1+ –10
 300+ – 0 50+ – 5 0 – 5

### Fourth Quarter 1971

Total Amount: $2,178.42

Range: $16.25 – $340.70

Top 3 Stores: $934.71 or 43%

Distribution: $ 500+ – 0 200+ – 1 25+ – 2
 400+ – 0 100+ – 5 1+ – 1
 300+ – 2 50+ – 6 0 – 7

### First Quarter 1972

Total Amount: $1,198.08

Range: $0.67 to $392.11

728

**Top 3 Stores:** $939.39 or 78%

**Distribution:**
| $ | | | |
|---|---|---|---|
| 500+ - 0 | 200+ - 1 | 25+ - 1 |
| 400+ - 0 | 100+ - 1 | 1+ - 5 |
| 300+ - 2 | 50+ - 0 | 0 - 1 |

## Second Quarter 1972

**Total Amount:** $506.09

**Range:** $1.11 to $164.98

**Top 3 Stores:** $ 362.09 or 72%

**Distribution:**
| $ | | | |
|---|---|---|---|
| 500+ - 0 | 200+ - 0 | 25+ - 0 |
| 400+ - 0 | 100+ - 1 | 1+ - 1 |
| 300+ - 0 | 50+ - 4 | 0 -16 |

## Third Quarter 1972

**Total Amount:** $355.65

**Range:** $18.70 to $104.66

**Top 3 Stores:** $216.64 or 61%

**Distribution:**
| $ | | | |
|---|---|---|---|
| 500+ - 0 | 200+ - 0 | 25+ - 4 |
| 400+ - 0 | 100+ - 1 | 1+ - 1 |
| 300+ - 0 | 50+ - 1 | 0 -21 |

## Fourth Quarter 1972

**Total Amount:** $556.35

**Range:** $9.70 - $195.32

**Top 3 Stores:** $387.01 or 70%

**Distribution:**
| $ | | | |
|---|---|---|---|
| 500+ - 0 | 200+ - 0 | 25+ - 2 |
| 400+ - 0 | 100+ - 2 | 1+ - 3 |
| 300+ - 0 | 50+ - 2 | 0 -12 |

## First Quarter 1973

**Total Amount:** $765.29

**Range:** $12.10 to $181.50

**Top 3 Stores:** $ 424.44 or 55%

**Distribution:**
| $ | | | |
|---|---|---|---|
| 500+ - 0 | 200+ - 0 | 25+ - 2 |
| 400+ - 0 | 100+ - 3 | 1+ - 3 |
| 300+ - 0 | 50+ - 3 | 0 -13 |

## Second Quarter 1973

Total Amount: $462.01

Range: $27.19 to $184.99

Top 3 Stores: $404.47 or 88%

Distribution: $ 500+ - 0 200+ - 0 25+ - 1
 400+ - 0 100+ - 2 1+ - 0
 300+ - 0 50+ - 1 0 -20

## Third Quarter 1973

Total Amount: $414.94

Range: $9.93 to $124.28

Top 3 Stores: $300.00 or 72%

Distribution: $ 500+ - 0 200+ - 0 25+ - 1
 400+ - 0 100+ - 1 1+ - 1
 300+ - 0 50+ - 3 0 -16

## Fourth Quarter 1973

Total Amount: $817.74

Range: $14.70 to $215.71

Top 3 Stores: $498.40 or 61%

Distribution: $ 500+ - 0 200+ - 1 25+ - 1
 400+ - 0 100+ - 2 1+ - 1
 300+ - 0 50+ - 4 0 -11

## First Quarter 1974

Total Amount: $474.18

Range: $54.42 to $214.20

Top 3 Stores: $474.17 or 100%

Distribution: $ 500+ - 0 200+ - 2 25+ - 0
 400+ - 0 100+ - 0 1+ - 0
 300+ - 0 50+ - 1 0 -18

## Second Quarter 1974

Total Amount: $429.12

Range: $5.39 to $176.30

730

Top 3 Stores: $336.45 or 78%

Distribution: $ 500+ - 0 200+ - 0 25+ - 1
 400+ - 0 100+ - 1 1+ - 4
 300+ - 0 50+ - 2 0 -15

## Third Quarter 1974

Total Amount: $503.66

Range: $59.94 to $148.06

Top 3 Stores: $368.68 or 73%

Distribution: $ 500+ - 0 200+ - 0 25+ - 0
 400+ - 0 100+ - 2 1+ - 0
 300+ - 0 50+ - 3 0 -15

## Fourth Quarter 1974

Total Amount: $594.40

Range: $4.76 to $174.96

Top 3 Stores: $359.24 or 60%

Distribution: $ 500+ - 0 200+ - 0 25+ - 2
 400+ - 0 100+ - 1 1+ - 2
 300+ - 0 50+ - 4 0 -14

## First Quarter 1975

Total Amount: $130.33

Range: $10.10 to $65.68

Top 3 Stores: $130.33 or 100%

Distribution: $ 500+ - 0 200+ - 0 25+ - 0
 400+ - 0 100+ - 0 1+ - 1
 300+ - 0 50+ - 2 0 . -22

C. PRODUCE MANAGERS

## Third Quarter 1971

Total Amount: $1,912.39

Range: $1.73 to $427.04

Top 3 Stores: $913.32 or 48%

| Distribution: | $ 500+ - 0 | 200+ - 2 | 25+ - 0 |
| | 400+ - 1 | 100+ - 3 | 1+ - 3 |
| | 300+ - 0 | 50+ - 7 | 0 - 7 |

## Fourth Quarter 1971

Total Amount: $2,285.09

Range: $23.85 to $433.70

Top 3 Stores: $979.94 of 43%

| Distribution: | $ 500+ - 0 | 200+ - 2 | 25+ - 2 |
| | 400+ - 1 | 100+ - 4 | 1+ - 2 |
| | 300+ - 0 | 50+ - 7 | 0 - 6 |

## First Quarter 1972

Total Amount: $3,076.18

Range: $6.65 - $542.24

Top 3 Stores: $1,242.78 or 40%

| Distribution: | $ 500+ - 1 | 200+ - 0 | 25+ - 0 |
| | 400+ - 0 | 100+ - 8 | 1+ - 2 |
| | 300+ - 2 | 50+ - 8 | 0 - 2 |

## Second Quarter 1972

Total Amount: $1,797.76

Range: $1.64 to 410.73

Top 3 Stores: $800.32 or 45%

| Distribution: | $ 500+ - 0 | 200+ - 1 | 25+ - 4 |
| | 400+ - 1 | 100+ - 6 | 1+ - 1 |
| | 300+ - 0 | 50+ - 3 | 0 - 5 |

## Third Quarter 1972

Total Amount: $1,138.39

Range: $29.40 to $224.28

Top 3 Stores: $588.64 or 52%

| Distribution: | $ 500+ - 0 | 200+ - 1 | 25+ - 2 |
| | 400+ - 0 | 100+ - 3 | 1+ - 0 |
| | 300+ - 0 | 50+ - 5 | 0 -10 |

### Fourth Quarter 1972

Total Amount: $2,041.17

Range: $1.16 to $327.29

Top 3 Stores: $795.11 or 39%

Distribution:
| $ 500+ – 0 | 200+ – 2 | 25+ – 1 |
|------------|----------|---------|
| 400+ – 0 | 100+ – 5 | 1+ – 4 |
| 300+ – 1 | 50+ – 7 | 0 – 3 |

### First Quarter 1973

Total Amount: $2,398.68

Range: $9.13 to $349.31

Top 3 Stores: $923.69 or 39%

Distribution:
| $ 500+ – 0 | 200+ – 2 | 25+ – 1 |
|------------|----------|---------|
| 400+ – 0 | 100+ – 5 | 1+ – 5 |
| 300+ – 2 | 50+ – 6 | 0 – 2 |

### Second Quarter 1973

Total Amount: $1,932.61

Range: $16.90 to $352.71

Top 3 Stores: $905.29

Distribution:
| $ 500+ – 0 | 200+ – 2 | 25+ – 3 |
|------------|----------|---------|
| 400+ – 0 | 100+ – 4 | 1+ – 3 |
| 300+ – 1 | 50+ – 3 | 0 – 4 |

### Third Quarter 1973

Total Amount: $2,788.36

Range: $4.44 to $547.22

Top 3 Stores: $1,099.19 or 39%

Distribution:
| $ 500+ – 1 | 200+ – 3 | 25+ – 1 |
|------------|----------|---------|
| 400+ – 0 | 100+ – 8 | 1+ – 2 |
| 300+ – 0 | 50+ – 3 | 0 |

### Fourth Quarter 1973

Total Amount: $3,978.84

Range: $17.83 – $438.58

Top 3 Stores: $1,176.55 or 30%

Distribution: $ 500+ - 0 200+ - 5 25+ - 0
 400+ - 2 100+ - 6 1+ - 1
 300+ - 2 50+ - 3 0 - 1

## First Quarter 1974

Total Amount: $3,099.50

Range: $31.53 to 403.19

Top 3 Stores: $1,071.87 or 35%

Distribution: 500+ - 0 200+ - 3 25+ - 2
 400+ - 1 100+ - 7 1+ - 0
 300+ - 1 50+ - 5 0 - 1

## Second Quarter 1974

Total Amount: $2,166.09

Range: $6.39 - $327.46

Top 3 Stores: $843.60 or 40%

Distribution: $ 500+ - 0 200+ - 1 25+ - 4
 400+ - 0 100+ - 4 1+ - 3
 300+ - 2 50+ - 5 0 - 1

## Third Quarter 1974

Total Amount: $2,024.68

Range: $10.03 to $352.27

Top 3 Stores: $817.44 or 40%

Distribution: $ 500+ - 0 200+ - 2 25+ - 1
 400+ - 0 100+ - 5 1+ - 3
 300+ - 1 50+ - 4 0 - 5

## Fourth Quarter 1974

Total Amount: $1,915.52

Range: $6.78 to $339.92

Top 3 Stores: $788.87 or 41%

Distribution: $ 500+ - 0 200+ - 2 25+ - 4
 400+ - 0 100+ - 4 1+ - 3
 300+ - 1 50+ - 4 0 - 9

First Quarter 1975

```
Total Amount: $2,564.64

Range: $ 4.08 to $294.95

Top 3 Stores: $804.18 or 31%

Distribution: $ 500+ - 0 $ 200+ - 4 25+ - 2
 400+ - 0 100+ - 7 1+ - 4
 300+ - 0 50+ - 7 0 - 5
```

## APPENDIX D

### ANALYSIS OF OPENINGS BY STORE

I have alluded in other places in the Report to my fascination—perhaps better read, obsession—with the Quarterly Bonus Accrual Charts. I have retained in my files—and have shown to counsel for both sides—my rough notes, charts, ramblings and conclusions.

The following is excerpted from these papers. It is not absolutely accurate—and is not worth the time and trouble that it would take to make it absolutely accurate. It does set out a reasonably accurate picture for each of the 19 stores that were open the entire Relevant Period and for Store 340—except for Produce Manager where only 8 stores were studied before I tired of the game. Disregarding the first two quarters of 1975, the following is a distribution of the number of stores among the twenty by the total number of persons who filled each of the three positions (including incumbents) during the Relevant Period:

| No. of Persons | Managers No. Of Stores | Ass't Managers No. Of Stores | Produce Managers No. Of Stores |
| --- | --- | --- | --- |
| 1 | - | - | 1 |
| 2 | 2 | 2 | 2 |
| 3 | 5 | 1 | - |
| 4 | 4 | 2 | 4 |
| 5 | 6 | 5 | - |
| 6 | 2 | 5 | - |
| 7 | 1 | 2 | - |
| 8 | - | 1 | 1 |
| 9 | - | - | - |
| 10 | - | 1 | - |
| 11 | - | 1 | - |

## APPENDIX E
### CORRECTION OF SHOP RITE'S TENURE CHARTS

Three charts included in Exhibit CH—"Tenure of Some Managers," "Tenure of Some Assistant Managers" and "Tenure of Some Produce Managers"—were prepared by Shop Rite and verified as to accuracy by Claimants. None of those three Charts contained incumbents and all included promotions to the end of the period. As explained in the accompanying text, these two "distortions" should be corrected. The other three charts—"Tenure of Other Managers," "Tenure of Other Assistant Managers" and "Tenure of Other Produce Managers"—does contain the information on incumbents.

They were prepared by Claimants and verified by Shop Rite. Combining the two charts for each position solves the first problem. The problem with 1975 promotees can be solved by consulting Exhibit BA and eliminating all those shown to have been hired or promoted into the managerial position during the first or second quarter of 1975. Since the "Some" charts are chronologically arranged, this is easy to do.

It is unnecessary to correct, combine and retype these new charts to arrive at a verifiable "median tenure time" for each position.

*Manager's Median Tenure*: The last four people on the "Some Managers" chart beginning with B. Stovall are 1975 hirees and

should be disregarded. This reduces the "Some" group to 29 in number, not 33. To the 29, is added the 22 in the "Other" group to make a total group of 51. The median would then be 26. Only two people from the "Some" group—E. Wooten and J. C. Mauldin—fall below the median. Consulting the "Some" chart's column "Median," subtracting the 4 and adding in the 2, we find that the new # 26 is old # 28–A. Svetlik at 87 weeks.

*Assistant Manager.* Following the same procedure, we eliminate 7 people beginning with T. Anderson, to make the new "Some" group 56 in number, not 63. To this is added the 19 "other" Managers, making a total group of 75, of which the median is # 38. Eliminating the 7 from the "Some" group would make old # 45–M. Burris at 42 weeks–the median, except that the one member of the "Other" group who does not fall above the median is Lloyd Akard, who is the median at 41 weeks.

*Produce Manager.* Five 1975 promotees on the "Some" chart–beginning with C. Davis were eliminated, making this group 29 in number. The 19 "Others" were added in, making a total of 48, with the median falling between # 24 and # 25. R. Worth at 66.5 weeks–old # 28 is now # 24–because Gay Peters on the "Other" list falls below him. D. Sullivan at 67 weeks also on the "Other" chart is now # 25, so the rounded median is 67 weeks.

## APPENDIX F
## ROUGH CALCULATION OF TENURE ODDS

Again, based on Exhibit CH and with the adjustments described in Appendix E to account for incumbent time and to eliminate 1975 promotees from each group, I did a count of how many within each of the three groups served within certain time intervals. For each group this distribution is set out below.

Then from this distribution, I made further groupings which are expressed in terms of "rough calculation of odds on tenure." I did include for some reason or other 76 people and not 75 in the Assistant Store Manager group. I have not attempted to locate the error since it is obviously insignificant. For all of the groups, I developed odds to be stated in terms of chances in 10. Thus, after each group of 7.5 Assistant Store Managers starting from the top of that Distribution Table (4.8 Produce Managers per group and 5 Store Managers), I drew a line and assigned that group an appropriate tenure interval. For example, the first 7.5 people in the "No. in Each Group" column for Assistant Managers–two people with less than 1 month, 2 less than 2 months and 3.5 less than 3 months–were first grouped. That group then was assigned a tenure interval of 2 months, and the first rough odd quoted was "1 in 10 2 months." So it goes.

The balance of this appendix, then, sets out the distribution of each group and the statement of the rough calculation of tenure odds.

### DISTRIBUTION OF ASSISTANT STORE MANAGERS

| TOTAL NUMBER IN GROUP | 76 |
|---|---|
| TOTAL NUMBER PROMOTED | 27 |

### DISTRIBUTION OF THE REST

| Not Less Than (Weeks) | Not More Than (Weeks) | No. In Each Group |
|---|---|---|
| 0 | 4 | 2 |
| 5 | 8 | 2 |
| 9 | 13 | 4 |
| 14 | 20 | 3 |
| 21 | 26 | 5 |
| 27 | 33 | 5 |

| Not Less Than (Weeks) | Not More Than (Weeks) | No. In Each Group |
|---|---|---|
| 34 | 39 | 5 |
| 40 | 45 | 2 |
| 46 | 52 | 5 |
| 53 | 78 | 12 |
| 79 | 104 | 2 |
| 105 | 130 | 1 |
| 131 | 156 | |
| 157 | 172 | |
| 173 | 208 | |
| 209 | 234 | 1 |
| 235 | 260 | |
| Over 260 | | |

## ROUGH CALCULATION OF ODDS
## ON TENURE OF ASSISTANT STORE MANAGERS

```
1 in 10 2 months
1 in 10 5 months
1 in 10 8 months
1 in 10 1 year
2 in 10 1-1/2 Years
4 in 10 Promoted
```

(The last 3 in the table, plus the 27 promoted equal 30 or 4 groups of 7.5.)

## DISTRIBUTION OF MANAGERS

TOTAL NUMBER IN GROUP 51

TOTAL NUMBER PROMOTED 4

## DISTRIBUTION OF THE REST

| Not Less Than (Weeks) | Not More Than (Weeks) | No. In Each Group |
|---|---|---|
| 0 | 4 | 2 |
| 5 | 8 | |
| 9 | 13 | 3 |
| 14 | 20 | 3 |
| 21 | 26 | 1 |
| 27 | 33 | 4 |
| 34 | 39 | |
| 40 | 45 | 5 |
| 46 | 52 | |
| 53 | 78 | 6 |
| 79 | 104 | 3 |
| 105 | 130 | 5 |
| 131 | 156 | 3 |
| 157 | 172 | |
| 173 | 208 | 1 |
| 209 | 234 | 2 |
| 235 | 260 | 3 |
| Over 260 | | 6 |

ROUGH CALCULATION OF ODDS
ON TENURE OF MANAGERS

1 in 10 3 months
1 in 10 6 months
1 in 10 10 months
1 in 10 1 year
1 in 10 2 years
1 in 10 2-1/2 years
1 in 10 3 years
3 in 10 Managing Forever

(Either at 2 years, 2-1/2 years, or 3 years the "Managing Forever" group could have been formed.)

DISTRIBUTION OF PRODUCE MANAGERS

TOTAL NUMBER IN GROUP 48

TOTAL NUMBER PROMOTED 4

DISTRIBUTION OF THE REST

| Not Less Than (Weeks) | Not More Than (Weeks) | No. In Each Group |
|---|---|---|
| 0 | 4 | 1 |
| 5 | 8 | 1 |
| 9 | 13 | 3 |
| 14 | 20 | 3 |
| 21 | 26 | 2 |
| 27 | 33 | 2 |
| 34 | 39 | 1 |
| 40 | 45 | 3 |
| 46 | 52 | 1 |
| 53 | 78 | 4 |
| 79 | 104 | 4 |
| 104 | 130 | 3 |
| 131 | 156 | 3 |
| 157 | 172 | 1 |
| 173 | 208 | 3 |
| 209 | 234 | 2 |
| 235 | 260 | 3 |
| Over 260 | | 4 |

ROUGH CALCULATION OF ODDS
ON TENURE OF PRODUCE MANAGERS

1 in 10 3 months
1 in 10 6 months
1 in 10 9 months
1 in 10 1 year
1 in 10 2 years
1 in 10 2-1/2 years
1 in 10 3-1/2 years
3 in 10 Produce Manager Forever

(As with Manager the "Forever" group could have been expanded; also, the 4 who were promoted could have formed a group for "Promoted" at 1 in 10.)

## APPENDIX G

### A WORLD I PROBABLY MADE

Several months ago, with time on my hands and at no one's expense other than the wife–kid–dog's, I calculated Maximum Back Pay awards for all the Claimants. With figures not quite as refined as in the Basis, using slightly different assumptions (using a base, but not a composite Claimant salary, for example) I came out with $298,166.60 as a Gross Maximum–with interest–assuming all Claimants for whom it was possible were promoted to Assistant Manager and a total of $216,195.34 if all such were promoted to Produce Manager. I did not total the aggregate amount due without interest–but, on the 6.18% compounding factor for the years involved and at that time, the then equivalent of the aggregate Vanilla awards (without interest or reduction) was about two–thirds of the with interest figure, or between $200,000 and $145,000. I also calculated the odds on tenure in position and possibility of promotion to manager or to supervisor. Those odds differed from the ones in this Report since they were drawn from my personal, inordinate fascination with the Quarterly Bonus Accrual Charts.

The last page of this Appendix is a xerox of a yellow sheet in my handwriting entitled "Playing the Game"–which I recently (almost as I write this) resurrected and which I had not seen in months. At that time I explicitly used the concept "Permanently Benefitted" as a rough equivalent of "Manager forever" used in this Report. There are some interesting comparisons with the Rough Odds in the Report. In September, 1979, I assigned to the Manager Group a 50% possibility to "Permanently Benefitted" and a 5% chance on being promoted to Supervisor–which corresponds rather nicely with the Rough Odds of 5 in 10 that a Manager had of lasting 2 years or better. The 15% assigned to 4, 8 and 12–months tenure is comparable to the 1 in 10 Rough Odds quoted for 3, 6 and 10–month and for 1 year. For the Assistant Manager Group, then and now I predicted 40% promoted to Manager. The old 33⅓% corresponds to the first three 1 in 10 odds on the shortest tenures. Then I made a simplifying assumption that after a certain time–I think after one or one and a half years, an Assistant Manager was assumed to be in the "Forever" category. This does overstate greatly the "permanent" Assistant Managers that did in fact exist–but was not bad for an assumption.

I missed Produce Manager by a wider mark–but I only had an eight–store sample (remember?) and it contained the low numbered stores which were skewed toward stability and I overcompensated. But–I am proud of the 50% "Forever and Permanently Benefitted" and the 5 in 10 odds for lasting two years or better.

I started to arbitrarily assign numbers of Claimants to various categories to see what the maximum effect would be, but decided to let Lady Luck do the job. Therefore, for each of the 7 Claimants that could go either way, I had a box with an equal number of slips of paper marked with "Assistant Manager" or "Produce Manager" and a draw was made for each of those Claimants. Then, I placed in three boxes–"Manager," "Produce Manager" and "Assistant Manager"–slips of paper that corresponded to the chances that a person would remain in a given position for a given length of time and had a separate box, with the proper number of slips, to decide which Assistant Managers were promoted. Memory dims, but I believe I assumed all Claimants on the Manager tract to be incumbent Assistant Managers at the beginning of the Period.

My secretary–thinking me quite insane–did the actual drawing and I recorded the results. There were some quirks that I adopted–for example, if a Claimant who did not aspire to Manager was "promoted" by the draw, it was assumed she refused the "promotion" and remained permanently as Assistant Manager. I then computed a "Due Without Interest" figure for each Claimant and aggregated the figures.

The whole process was repeated three times. The aggregate without interest figures were $65,846.25 for Draw No. 1, $95,193.06 for Draw No. 2, and $69,761.10 for Draw No. 3. The big difference in Draw No. 2 was that a couple of people who wanted the job got luckily promoted to Supervisory. Maybe there was stickum on the 5% card. These figures compare to the maximum of approximately $200,000 (all seven to Assistant Managers) to $145,000 (all seven to Produce Managers) and indicated that a range of somewhere between a 2/3rds reduction to a one–half reduction across the board from the Maximum Award is probably real and fair.

A similar Model could be constructed with the refined figures in the Basis. It will–probably–not be significantly different. It certainly won't be done by me.

I. (Assume... of the Claims - 1 ... Mgr Cmlts, 1 ... Mgr, 3 Assistgs.)
(... Mgr + 5 Supervisors)

II. (... of the Claims - 1 ... Asst Clm, 4 ... Mgr, 0 Asst Mgr,
8 Mgr + 5 Supervs.)

---

## APPENDIX H

## COMPUTATIONS FOR ADJUSTED AWARDS

This Appendix sets out the calculations on which 12 Claimants' award was predicated under the Methodology described in Pages 741–743. The first two columns here correspond with the "Weeks Each Year" and "Weekly Diff." columns from Appendix A. The difference is these two columns are to take into account the adjusted percentage reductions based on the tenure odds. The total number of weeks worked each year here is the same here as in Appendix A.

The "Percent Allowed" column contains figures that correspond in inverse fashion to the reduction recommended based on the tenure odds, e. g., the 25% reduction in Assistant Manager's pay after 41 weeks is equivalent to the 75% figure in this column. The "Basic Back Pay" column is the product of the first three columns. For each Claimant, this column is totaled to facilitate comparison with the Grand Total in the Vanilla Award. The "Interest Factor" column is self-explanatory; the following "With Interest to Mid Point" column is the product of the two preceding columns. The "Interest to 7/1/80" column is likewise self-explanatory in light of the Report's methodology and the Total column simply sums the preceding two columns.

### CLAIMANT: BRAMMER

Position(s): Assistant Manager/Manager

| Weeks Ea.Yr. | Weekly Diff. | Percent Allowed | Basic Back Pay | Interest Factor | Interest To Mid Point | Interest To 7/1/80 | Total |
|---|---|---|---|---|---|---|---|
| 1972-26 | $ 55 | 100% | $ 1,430 | 1.61563 | $2,310.35 | | $2,310.35 |
| 1973-15 | 48 | 100% | 720 | 1.52159 | 1,095.54 | | 1,095.54 |
| 1973-37 | 48 | 75% | 1,332 | 1.52159 | 2,026.76 | | 2,026.76 |
| 1974-13 | 110 | 100% | 1,430 | 1.43303 | 2,049.23 | | 2,049.23 |
| 1974-13 | 110 | 90% | 1,287 | 1.43303 | 1,844.31 | | 1,844.31 |
| 1974-17 | 110 | 80% | 1,496 | 1.43303 | 2,143.81 | | 2,143.81 |
| 1974- 9 | 110 | 70% | 693 | 1.43303 | 993.09 | | 993.09 |
| 1975-23 | 96 | 60% | 1,325 | 1.34963 | 1,787.99 | 31.48 | 1,819.47 |

Back Pay Total: $ 9,713 Grand Total $14,282.56

### CLAIMANT: CARTER

Position(s): Manager

| Weeks Ea.Yr. | Weekly Diff. | Percent Allowed | Basic Back Pay | Interest Factor | Interest To Mid Point | Interest To 7/1/80 | Total |
|---|---|---|---|---|---|---|---|
| 1971-29 | 82 | 100% | 2,378 | 1.61563 | 3,841.97 | 186.04 | 4,028.01 |
| 1972-52 | 93 | 100% | 4,836 | 1.61563 | 7,813.18 | | 7,813.18 |
| 1973- 6 | 97 | 100% | 582 | 1.52159 | 885.57 | | 885.57 |
| 1973-46 | 97 | 60% | 2,677 | 1.52159 | 4,073.60 | | 4,073.60 |
| 1974- 6 | 110 | 60% | 396 | 1.43303 | 567.48 | | 567.48 |
| 1974-42 | 110 | 50% | 2,310 | 1.43303 | 3,310.30 | | 3,310.30 |
| 1974- 4 | 110 | 50% | 220 | 1.43303 | 315.27 | | 315.27 |
| 1975-23 | 96 | 50% | 1,104 | 1.34963 | 1,489.99 | 25.98 | 1,515.97 |

Back Pay Total: $ 14,503 Grand Total: $22,509.38

CLAIMANT: DEBORD

Position(s): Ass't Manager/Manager

| Weeks Ea.Yr. | Weekly Diff. | Percent Allowed | Basic Back Pay | Interest Factor | Interest To Mid Point | Interest To 7/1/80 | Total |
|---|---|---|---|---|---|---|---|
| 1971-29 | 53 | 100% | 1,537 | 1.61563 | 2,483.22 | 120.25 | 2,603.47 |
| 1972-12 | 55 | 100% | 660 | 1.61563 | 1,063.63 | | 1,063.63 |
| 1972-28 | 55 | 75% | 1,155 | 1.61563 | 1,866.05 | | 1,866.05 |
| 1972-12 | 93 | 100% | 1,116 | 1.61563 | 1,803.04 | | 1,803.04 |
| 1973- 1 | 93 | 100% | 93 | 1.52159 | 141.51 | | 141.51 |
| 1973-13 | 93 | 90% | 1,088 | 1.52159 | 1,655.64 | | 1,655.64 |
| 1973-17 | 93 | 80% | 1,265 | 1.52159 | 1,924.51 | | 1,924.51 |
| 1973- 9 | 93 | 70% | 586 | 1.52159 | 891.50 | | 891.50 |
| 1973-12 | 93 | 60% | 670 | 1.52159 | 1,018.86 | | 1,018.86 |
| 1974-52 | 110 | 60% | 3,432 | 1.43303 | 4,918.16 | | 4,918.16 |
| 1975-23 | 96 | 60% | 1,325 | 1.43303 | 1,898.48 | 33.43 | 1,931.91 |

Back Pay Total $ 12,927 Grand Total: 19,818.28

CLAIMANT: DECKER

Position(s): Manager

| Weeks Ea.Yr. | Weekly Diff. | Percent Allowed | Basic Back Pay | Interest Factor | Interest To Mid Point | Interest To 7/1/80 | Total |
|---|---|---|---|---|---|---|---|
| 1971-29 | 82 | 100% | 2,378 | 1.61563 | 3,841.97 | 186.04 | 4,028.01 |
| 1972-52 | 93 | 100% | 4,836 | 1.61563 | 7,813.19 | | 7,813.19 |
| 1973- 6 | 97 | 100% | 582 | 1.52159 | 885.57 | | 885.57 |
| 1973-46 | 97 | 60% | 2,677 | 1.52159 | 4,073.60 | | 4,073.60 |
| 1974- 6 | 110 | 60% | 396 | 1.43303 | 567.48 | | 567.48 |
| 1974-42 | 110 | 50% | 2,310 | 1.43303 | 3,310.30 | | 3,310.30 |
| 1974- 4 | 110 | 50% | 220 | 1.43303 | 315.27 | | 315.27 |
| 1975-23 | 96 | 50% | 1,104 | 1.34963 | 1,489.99 | 25.98 | 1,515.97 |

Back Pay Total: $ 14,503 Grand Total: $22,509.39

CLAIMANT: DUNAFAN

Position(s): Manager

| Weeks Ea.Yr. | Weekly Diff. | Percent Allowed | Basic Back Pay | Interest Factor | Interest To Mid Point | Interest To 7/1/80 | Total |
|---|---|---|---|---|---|---|---|
| 1971-29 | 82 | 100% | 2,378 | 1.61563 | 3,841.97 | 186.04 | 4,028.01 |
| 1972-45 | 93 | 100% | 4,185 | 1.61563 | 6,761.41 | | 6,761.41 |
| 1973-13 | 97 | 100% | 1,261 | 1.52159 | 1,918.72 | | 1,918.72 |
| 1973-39 | 97 | 60% | 2,270 | 1.52159 | 3,453.70 | | 3,453.70 |
| 1974-13 | 110 | 60% | 858 | 1.43303 | 1.229.54 | | 1,229.54 |
| 1974-34 | 110 | 50% | 1,870 | 1.43303 | 2,679.77 | | 2,679.77 |
| 1975-23 | 96 | 50% | 1,104 | 1.34963 | 1,489.99 | 25.98% | 1,515.97 |

Back Pay Total: $ 13,926 Grand Total: $21,587.12

CLAIMANT: INGLET

Position(s): Manager

| Weeks Ea.Yr. | Weekly Diff. | Percent Allowed | Basic Back Pay | Interest Factor | Interest To Mid Point | Interest To 7/1/80 | Total |
|---|---|---|---|---|---|---|---|
| 1972-39 | 93 | 100% | 3,627 | 1.61563 | 5,859.89 | | 5,859.89 |
| 1973-48 | 97 | 100% | 4,656 | 1.52159 | 7,084.52 | | 7,084.52 |
| 1973- 4 | 97 | 100% | 388 | 1.52159 | 590.38 | | 590.38 |
| 1974-52 | 110 | 60% | 3,432 | 1.43303 | 4,918.16 | | 4,918.16 |
| 1975-23 | 96 | 50% | 1,104 | 1.34963 | 1,489.99 | 25.98 | 1,515.97 |

Back Pay Total: $ 13,207 Grand Total: $19,968.92

CLAIMANT: MASSEY

POSITION(S): MANAGER

| Weeks Ea.Yr. | Weekly Diff. | Percent Allowed | Basic Back Pay | Interest Factor | Interest To Mid Point | Interest To 7/1/80 | Total |
|---|---|---|---|---|---|---|---|
| 1971-29 | 82 | 100% | 2,378 | 1,61563 | 3,841.97 | 186.04 | 4,028.01 |
| 1972-40 | 93 | 100% | 3,720 | 1,61563 | 6,010.14 | | 6,010.14 |
| 1973-18 | 97 | 100% | 1,746 | 1.52159 | 2,656.70 | | 2,656.70 |
| 1973-26 | 97 | 60% | 1,513 | 1.52159 | 2,302.47 | | 2,302.47 |
| 1974-26 | 110 | 60% | 1,716 | 1.43303 | 2,459.08 | | 2,459.08 |
| 1974-26 | 110 | 50% | 1,430 | 1.43303 | 2,049.23 | | 2,049.23 |
| 1975-23 | 96 | 50% | 1,104 | 1.34963 | 1,489.99 | 25.98 | 1,515.97 |

Back Pay Total: 13,607 Grand Total: 21,021.60

CLAIMANT: PUGH

Position(s): Manager

| Weeks Ea.Yr. | Weekly Diff. | Percent Allowed | Basic Back Pay | Interest Factor | Interest To Mid Point | Interest To 7/1/80 | Total |
|---|---|---|---|---|---|---|---|
| 1971-29 | 82 | 100% | 2,378 | 1.61563 | 3,841.97 | 186.04 | 4,028.01 |
| 1972-52 | 93 | 100% | 4,836 | 1.61563 | 7,813.19 | | 7,813.19 |
| 1973- 6 | 97 | 100% | 582 | 1.52159 | 885.57 | | 885.57 |
| 1973-46 | 97 | 60% | 2,677 | 1.52159 | 4,073.60 | | 4,073.60 |
| 1974- 6 | 110 | 60% | 396 | 1.43303 | 567.48 | | 567.48 |
| 1974-38 | 110 | 50% | 2,090 | 1.43303 | 2,995.03 | | 2,995.03 |
| 1975-23 | 96 | 50% | 1,104 | 1.34963 | 1,489.99 | 25.98 | 1,515.97 |

Back Pay Total: 14,063 Grand Total: 21,878.85

CLAIMANT: SPAFFORD

Position(s): Manager

| Weeks Ea.Yr. | Weekly Diff. | Percent Allowed | Basic Back Pay | Interest Factor | Interest To Mid Point | Interest To 7/1/80 | Total |
|---|---|---|---|---|---|---|---|
| 1971-29 | 82 | 100% | 2,378 | 1.61563 | 3,841.97 | 186.04 | 4,028.01 |
| 1972-52 | 93 | 100% | 4,836 | 1.61563 | 7,813.19 | | 7,813.19 |
| 1973- 6 | 97 | 100% | 582 | 1.52159 | 885.57 | | 885.57 |
| 1973-46 | 97 | 60% | 2,677 | 1.52159 | 4,073.60 | | 4,073.60 |
| 1974- 6 | 110 | 60% | 396 | 1.43303 | 567.48 | | 567.48 |
| 1974-46 | 110 | 50% | 2,530 | 1.43303 | 3,625.57 | | 3,625.57 |
| 1975-23 | 96 | 50% | 1,104 | 1.34963 | 1,489.99 | 25.98 | 1,515.97 |

Grand Total: $ 14,503 Grand Total: 22,509.39

CLAIMANT: STELK

Position(s): Asst. Manager/Manager

| Weeks Ea.Yr. | Weekly Diff. | Percent Allowed | Basic Back Pay | Interest Factor | Interest To Mid Point | Interest To 7/1/80 | Total |
|---|---|---|---|---|---|---|---|
| 1971-29 | 53 | 100% | 1,537 | 1.61563 | 2,483.22 | 120.25 | 2,603.47 |
| 1972-12 | 55 | 100% | 660 | 1.61563 | 1,066.32 | | 1,066.32 |
| 1972-11 | 55 | 75% | 454 | 1.61563 | 733.09 | | 733.09 |
| 1972-13 | 93 | 100% | 1,209 | 1.61563 | 1,953.30 | | 1,953.30 |
| 1972-13 | 93 | 90% | 1,088 | 1.61563 | 1,757.97 | | 1,757.97 |
| 1972- 3 | 93 | 80% | 232 | 1.61563 | 375.15 | | 375.15 |
| 1973-14 | 97 | 80% | 1,086 | 1.52159 | 1,653.06 | | 1,653,06 |
| 1973- 9 | 97 | 70% | 611 | 1.52159 | 929.84 | | 929.84 |
| 1973-29 | 97 | 60% | 1,688 | 1.52159 | 2,568.14 | | 2,568.14 |
| 1974-52 | 110 | 60% | 3,432 | 1.43303 | 4,918.16 | | 4,918.16 |
| 1975- 6 | 96 | 60% | 346 | 1.34963 | 466.43 | 8.21 | 474.64 |
| 1975-17 | 96 | 50% | 816 | 1.34963 | 1,101.30 | 19.39 | 1,120.69 |

Back Pay Total: $ 13,159 Grand Total: 20,153.83

CLAIMANT: YARBROUGH

Position(s): Manager

| Weeks Ea.Yr. | Weekly Diff. | Percent Allowed | Basic Back Pay | Interest Factor | Interest To Mid Point | Interest To 7/1/80 | Total |
|---|---|---|---|---|---|---|---|
| 1971-20 | 82 | 100% | 1,640 | 1.61563 | 2,649.63 | 128.31 | 2,777.94 |
| 1972-52 | 93 | 100% | 4,836 | 1.61563 | 7,813.19 | | 7,813.19 |
| 1973-15 | 97 | 100% | 1,455 | 1.52159 | 2,213.91 | | 2,213.91 |
| 1973-15 | 97 | 60% | 873 | 1.52159 | 1,328.35 | | 1,328.35 |

Back Pay Total: $ 8,804 Grand Total: 14,133.39

CLAIMANT: BROWN

Position(s): Produce Manager

| Weeks Ea.Yr. | Weekly Diff. | Percent Allowed | Basic Back Pay | Interest Factor | Interest To Mid Point | Interest To 7/1/80 | Total |
|---|---|---|---|---|---|---|---|
| 1971-29 | 32 | 100% | 928 | 1.61563 | 1,499.30 | 64.73 | 1,564.03 |
| 1972-38 | 36 | 100% | 1,368 | 1.61563 | 2,210.18 | | 2,210.18 |
| 1972-14 | 36 | 80% | 403 | 1.61563 | 651.42 | | 651.42 |
| 1973-38 | 33 | 80% | 1,003 | 1.52159 | 1,526.46 | | 1,526.46 |
| 1973-14 | 33 | 70% | 323 | 1.52159 | 492.08 | | 492.08 |
| 1974-38 | 38 | 70% | 1,010 | 1.43303 | 1,448.51 | | 1,448.51 |
| 1974-14 | 38 | 60% | 319 | 1.43303 | 457.42 | | 457.42 |
| 1975-23 | 1 | 60% | 13 | 1,34963 | 18.62 | .32 | 18.94 |

$ 5,367 8,369.04

All of the above is without bonus. Brown gets the maximum $605 in bonuses. Since payment should have been spread over the period, but came predominantly in 1973, I used that year's Interest Factor to add $920.56 to the above total, making her award now $8,390.

## APPENDIX I

## INCOME TAX CALCULATIONS

As described in the body of the Report, attempts were made to calculate the effects of income tax on the back pay award by utilizing two Claimants, Ruth Brammer and Betty Spafford.

The first chart below is for Ruth Brammer. The figures for the year 1972–75 for "Actual Taxable Income" equal the amounts assumed for her in the test (based on Paragraph 34 of the Basis) less the Personal Exemption deduction and the Standard Deduction for each year. Column 3 similarly represents the Taxable Income– gross less the two Deductions–after the Maximum Award for that year were added in. The taxes in column (2) and (4) are calculated as the rates in effect for those years. In 1980, the assumptions are reversed. The $20,102 figure is the $9,500 assumed plus the Vanilla Award less only the Personal Exemption Deduction (the "zero bracket amount" having replaced the Standard Deduction) and the $8,500 is the $9,500, again less $1,000 for the Exemption.

In the first chart for Betty Spafford, the methodology was the same except the actual taxable income from her joint returns was available for each year. For the second chart relating to her, we assumed that she earned interest at 6.18% on the amount that she should have received the year before, thereby increasing in a compounding fashion the income of each year after 1971. The years 1976–79 must now be included since she hypothetically earned interest those years as well. Spreading the

interest was done in a rough fashion, the main purposes of which were to take all the interest into account–but nothing more–and not distorting any one year. As stated in the Text, it is more logical to ignore interest in making the tax calculation since it would not have been paid or earned except in the context of a court order; therefore, it is like any other pre–judgment interest for which no adjustment is made.

## RUTH BRAMMER

### 1972-80 Tax Differential Between Actual Taxes Due and Taxes That Would Have Been Due If Back Pay Distributed On Time

| Year | (1) Actual Taxable Income | (2) Tax On Col.1 | (3) Taxable Income If Back Pay Distributed In Prior Years | (4) Tax On Col. (3)* | (5) Tax Differential (4)-(2) |
|------|------|------|------|------|------|
| 1972 | $ 5,066 | $ 914 | $6,596 | $1,253 | ($339) |
| 1973 | 6,036 | 1,119 | 8,532 | 1,723 | ( 604) |
| 1974 | 6,917 | 1,330 | 12,385 | 2,742 | (1,412) |
| 1975 | 7,840 | 1,552 | 10,048 | 2,103 | ( 551) |
| 1976-79 | No Difference between actual and probable taxable income and taxes thereon. | | | | |
| 1980 | 20,102 | 3,448** | 8,500 | 1,072 | 2,376 |

TOTAL INCREASE (DECREASE) IN TAX DUE TO
RECEIPT OF BACK PAY UNTIL 1980 ($530)

\* From Tax Rates for Unmarried Taxpayers, using the standard deduction (zero bracket amount in 1980), and one personal exemption.

\*\* Income Averaging used to calculate tax.

BETTY SPAFFORD

### 1971-80 Tax Differential Between
### Actual Taxes Due and Taxes That Would Have Been Due
### If Back Pay Distributed On Time

| Year | (1)<br>Actual<br>Taxable Income | (2)<br>Tax On<br>Col.1 | (3)<br>Taxable<br>Income If<br>Back Pay<br>Distributed<br>In Prior<br>Years | (4)<br>Tax<br>On Col.<br>(3)* | (5)<br>Tax<br>Differential<br>(2)-(4) |
|------|------|------|------|------|------|
| 1971 | $16,599 | $3,428 | $18,977 | $4,094 | ($ 666) |
| 1972 | 15,466 | 3,127 | 20,302 | 4,477 | (1,350) |
| 1973 | 20,248 | 4,517 | 25,292 | 6,125 | (1,608) |
| 1974 | 24,325 | 5,777 | 30,045 | 7,898 | (2,121) |
| 1975 | 25,703 | 6,273 | 27,911 | 7,068 | ( 795) |
| 1976-79 | No difference between actual and probable taxable income and taxes thereon | | | | |
| 1980 | 46,186 | 12,753 | 26,000 | 4,953 | 7,800 |

TOTAL INCREASE IN TAX DUE TO RECEIPT OF BACK PAY
IN LUMP SUM $ 1,260

* From Tax Rates for Married Tax Payers, Filing jointly using
the Standard Deduction (zero bracket amount in 1980), and
two personal exemptions.

** Income Averaging used to calculate tax.

BETTY SPAFFORD

### 1971-80 Tax Differential Between Actual Taxes Due and Taxes That Would Have Been Due If Back Pay (and Interest thereon) Had Been Distributed on Time

| Year | (1) Actual Taxable Income | (2) Tax On Col.1 | (3) Taxable Income If Back Pay Distributed In Prior Years | (4) Tax On Col. (3)* | (5) Tax Differential (2)-(4) |
|---|---|---|---|---|---|
| 1971 | $16,599 | $3,428 | $18,977 | $4,094 | $ (666) |
| 1972 | 15,466 | 3,127 | 20,338 | 4,488 | (1,361) |
| 1973 | 20,248 | 4,517 | 25,738 | 6,286 | (1,769) |
| 1974 | 24,325 | 5,777 | 30,803 | 8,193 | (2,416) |
| 1975 | 25,703 | 6,273 | 29,022 | 7,499 | (1,226) |
| 1976 | 26,385 | 6,519 | 27,565 | 6,943 | (424) |
| 1977 | 34,462 | 8,372 | 35,714 | 8,876 | (504) |
| 1978 | 28,783 | 6,230 | 30,113 | 6,709 | (479) |
| 1979 | 22,667 | 3,964 | 24,079 | 4,359 | (395) |
| 1980 | 56,501 | 17,188* | 26,750 | 5,193 | (11,995) |

TOTAL INCREASE DUE TO RECEIPT OF BACKPAY WITH
INTEREST IN LUMP SUM $2,755

\* From Tax Rates for Married Taxpapers, filing jointly,
using the standard deduction (zero bracket amount for
years subsequent to 1976), and two personal exemptions.

\*\* Income Averaging used to calculate tax.

---

## APPENDIX J

## PLAYING THE GAME AGAIN–AGAIN

Despite what the concluding section on Exhibit G would have you believe, I did play the Model game again. It was a much simpler game this time than it was before–dealing with 11 Claimants all on the Assistant Manager's track, eight of which never were Assistant Managers during the Relevant Period. And it was much simpler after I had finished playing than it was when I started.

First, all 11 players should start at "Go." We assume that all were, at some time whether in the Period or before, double–promoted and never fired. So we can safely assume promotion to Assistant on day one.

Second, the "Rough Odds" table for Assistant Managers were used as set out above–with an assumption greatly favoring the Claimants. The odds on working more than one year, but less than 78 weeks, were included with the four odds that a Claimant would be promoted to favor promotion by odds of 6 in 10. So if the first 10–sided die were a "1" the Claimant was assumed to have worked 8 weeks as Assistant Manager

and not to have been promoted. If it were a "5" or higher, she would have worked 78 weeks and have been promoted. If promoted, the second die would be consulted to see how long she would have served as a Manager. An adjustment must be made to our 208 week period; it is shortened by the 78 weeks which an Assistant Manager worked, and thus becomes a maximum of 130. The Rough Odds table for Managers must then be adjusted in proportion (130 ÷ 208), or as follows:

1 in 10 8 weeks (not 13)
1 in 10 16 weeks (not 26)
1 in 10 27 weeks (not 43)
1 in 10 33 weeks (not 52)
1 in 10 65 weeks (not 104)
1 in 10 81 weeks (not 130)
1 in 10 98 weeks (not 156)
3 in 10 130 weeks (not 208)

So if the second die were a "3," the Claimant worked 27 weeks as Manager. The total for all Claimants for each category was tallied, the Assistant time was divided by two and added to the Manager's time to compare with the 1859 WIMS, as reported in the Text.

A word about methodology—I do not have a ten–sided die. (I do have an 8, a 12 and a 16, or something like that). I made six "draws" with the help of my wife and my son. Everything was done to assure randomness. Cards were used for two draws, ten Boggle cubes (each cube contains six letters, one on each face) for two, and two different sets of Bingo numbers with turner for the last two. Since at that time I assumed the eight Managers were to be treated differently from the three others, I only made one entry per draw for them while I made two for the Assistant Managers—Managers. I determined which two of the six draws for the group of 8 and for the group of 3—since they were tabulated separately—were the extremes, and used the other four. To get my second draw for the eight Managers, I turned their four draws upside down and rotated them. The four draws for the two groups were also combined solely by chance.

On the ten Boggle cubes, only three were completely unique–those which had the one "Z", the one "X", and both the single "J" and "Q." One of the "K's" remained "K," and the other became "Key." There was a "AA," and a "REAL" cube, and a "GIRL" cube, appropriately a "GET/GIVE" cube, and, my favorite, "BATY," for which I assumed the missing "T." When the time came, "BATY" was the first cube I drew. I think I've been told something by the Gods of Chance.